503 P.2d 979

**Orlin V. WRY, Jr., and Constance D. Wry, Individually and as husband and wife, Appellants,**

**v.**

**Joe H. DIAL and Arrah L. Dial, husband and wife, and David L. Hudnall and Patricia B. Hudnall, husband and wife, Appellees.**

**No. 2 CA–CIV 1251.**

Court of Appeals of Arizona, Division 2.

Dec. 12, 1972.

Rehearing Denied Jan. 10, 1973.

Review Denied Feb. 6, 1973.

---

**504**

Chandler, Tullar, Udall & Richmond by Thomas Chandler, Tucson, for appellants.

Law Offices of Richard D. Grand and Thomas J. McHugh by Richard D. Grand and Thomas J. McHugh, Tucson, for appellees.

HOWARD, Judge.

This action arises out of a two-car accident which occurred on August 6, 1971. Liability was admitted and a four-day trial was had in the superior court on the issue of damages. Unanimous verdicts were rendered by the jury in favor of the appellees Joe H. Dial and Arrah L. Dial in the sum of $3,500,000 and in favor of the appellees David L. Hudnall and Patricia B. Hudnall in the sum of $401,750.

Appellants Wry filed a motion for new trial or for remittitur, both of which were denied by the trial judge. They appeal from the judgment and from the trial court's denial of their motions.

Appellants present the following questions for review: (1) Was counsel for Dial and Hudnall guilty of prejudicial misconduct in statements made to the jury during trial? (2) If plaintiffs' counsel was guilty of misconduct, did the trial court abuse its discretion in not granting a

new trial even though defendants' counsel [1] made no objection to such misconduct prior to defendants' motion for new trial? (3) Were the verdicts the result of passion and prejudice on the part of the jury? (4) Were the verdicts so excessive as to require the trial court to order a remittitur in each case? (5) Were the Hudnalls' requested instructions four and five erroneous and prejudicial?

Because of the questions involved, we deem it necessary to set forth the facts at length considered in the light most favorable to upholding the verdict of the jury. They are as follows: On August 6, 1971, Joe Dial and Arrah Dial, husband and wife, were 32 and 29 years of age respectively. They had lived in Tucson for five years and had a one-year-old daughter. Arrah Dial was a graduate of the University of Redlands and had a master's degree in education from the University of Arizona. Joe Dial was a graduate of the University of Redlands and had a master's degree in electrical engineering. All Joe Dial needed for his Ph.D. degree was the completion of his dissertation, which he was in the process of writing. While working at this, he was employed part-time as a researcher for Dr. Paul Johnson at the University of Arizona. Dr. Johnson's particular field was physiology. Because of Joe Dial's expertise in the field of electrical engineering, he was working with Dr. Johnson to develop special instrumentation in the field of microcirculation.[2]

Dr. Johnson testified that he was delighted with Joe Dial because he had a good capability for designing instruments, seeing improvements that were needed and how this should be accomplished. Dial was instrumental in developing two separate instruments which the laboratory is now using. One measures the capillary hematocrit (a concentration of red cells in the capillaries) and the other involves the application of drugs directly to the microvessels. As a result of Dial's designing an instrument for the measuring of the red cells concentration, Dr. Johnson was able to solve the problem as to whether red cells and plasma took different routes to the capillaries.

Joe Dial, together with a Dr. Robert W. Gore of the physiology department, authored a paper published in the Journal of Applied Psychology entitled "A capacitive-discharge, microiontophoretic device with single-ended output". He also co-authored an article which was published in the American Journal of Physiology entitled "Influence of flow variations on capillary hematocrit in mesentery".

Although Dr. Johnson had worked for the past ten years with several engineers, he felt that Joe Dial was exceptional in that he was able to communicate with him across the barrier of engineering to biology and medicine. He could discuss a problem with Joe that needed solution, take him to the laboratory, show him the phenomenon under the microscope, and ask him to come up with the means of solving the problem. Dr. Johnson never found anyone better than Joe Dial in this respect. Not only could Dial solve the problems, but after doing so he continued thinking about them and sometimes came up with an even better way of solving them. Dial's associates, companions and superiors found him a pleasant person, somewhat on the quiet side. He was very easy to talk to and seemed quite stable. He had no major problems and seemed to relate to people easily. It was easy to talk to Joe. He understood and was able to concentrate very well on subjects that were being discussed.

Because of Dial's growing interest in the relationship between engineering and medicine, it was arranged for him to enter the physiology department after he received his Ph.D. degree in electrical engineering

---

1. Counsel on appeal was not defendants' counsel at trial.

2. The study of the travel of red blood cells through the capillaries, and some of the factors which control the circulation of blood throughout the tissues of the body.

to spend at least two years working in the research laboratory with Dr. Stewart, a professor of physiology specializing in neurophysiology. His salary at that time would have been approximately $9,000 with some fringe benefits. After doing his post-doctoral work with the University, Dial would have been making approximately $16,000 a year as an assistant professor. If he had completed this work in the department and risen to a full professorship, his earnings would have doubled. Dr. Johnson felt that Dial had a special talent greatly in demand in industry and in the field of medical instrumentation. Joe Dial had a great potential in the relationship of electrical engineering to bio-medicine.

Dr. Douglas G. Stewart testified that he became interested in Dial because of this potential and in particular was interested in how Dial could help him in his own research program on the neuro-control of movement. This interest was conveyed to Dial who had decided that when he received his Ph.D. in electrical engineering he would stay in the department working with Dr. Stewart on his research project. Dr. Stewart was helping Dial to prepare for a grant from the National Institute of Health which would have supported Dial's post-doctoral work and paid his salary for several years. Dr. Stewart felt that with two or three more years in the lab, Dial would have been, if not number one, at least the number two man in his field in the country. As far as Dr. Stewart was concerned, Joe Dial's future was unlimited.

Prior to August 6, 1971, Joe Dial was very active athletically. He and his wife both played tennis about three times a week. He played basketball, baseball and belonged to a volleyball group which met on Thursday evenings. He rode his bicycle to and from work every day, and had a morning physical fitness program. He and his wife did a lot of hiking, backpacking and camping. Physical fitness was very important to him and he spent a great deal of time outdoors in the sunshine.

Joe Dial was extremely intelligent, creative, and took great pride in his creativity. He was also a very calm person with a lot of self-assurance. In a group he was not a talker, but rather more of a listener and observer, and spoke only when an important point had to be made. He was an attractive man as far as his wife was concerned. He was an exceptional engineer with a quick mind, lots of ideas, did not mind hard work and pushed his ideas through.

On August 6, 1971, Joe Dial was brought to the emergency room of St. Mary's Hospital as a result of the automobile collision which caused his automobile to catch fire. He was first seen by Dr. Morton Aronoff, a specialist in plastic and reconstructive surgery. At that time Dial was severely burned, primarily around his face, neck, shoulders and back. He was admitted immediately to the hospital's Burn Unit. Dr. Charles Elkins was immediately called to see him in regard to possible brain injury because of his comatose condition. Dr. Elkins thought he was suffering from severe concussion and examined him for an intracranial injury or blood clot formation. An electroencephalogram was performed and was somewhat abnormal. Dr. Elkins was of the opinion that Dial was suffering from a concussion and not a neurological problem. After Dr. Aronoff satisfied himself that the head injury need not be attended to immediately by a neurosurgeon, he concerned himself with the burns. His diagnosis was that Joe Dial had first, second and third degree burns of his face, neck, mouth, arms, back and legs, and had a cerebral concussion.

His initial examination revealed that Dial had severe burns over his entire face, neck and ears. The inside of his mouth, his tongue and his tonsils were also burned and Dial developed signs of respiratory obstruction. The inside of his throat, the inside of his mouth and his entire face began to swell. Because of the swelling he was taken to surgery on August 7. Prior to the operation a general anesthesia was not

given because Dial was irrational, comatose, and every so often made wild gestures his arms and legs. A few intravenous drugs were given to obtain a local anesthesia. Under this type of anesthesia the doctor performed a tracheotomy to relieve Dial's breathing. The tracheotomy consisted of making a cut in the base of Dial's neck and putting a tube into his air passage.

Prior to the tracheotomy Dial had to be treated for shock. This involved putting a catheter in his bladder to monitor his urinary output. A catheter also had to be inserted into one of his veins to give him fluid in the form of electrolytes and cholines to prevent shock and to maintain him.

For the first two or three days of hospitalization Joe Dial was in a state of coma and did not respond, even to painful stimulation. During that time he was receiving moderate sedation because of his head injury. On the third, fourth and fifth days he went into a state of stupor. He was irrational to a great degree, his movements were uncoordinated, and he thrashed around.

On the fifth post-operative day the tracheotomy tube was removed. The swelling inside Dial's mouth and neck subsided and he was able to breathe on his own. At that point he was able to talk and respond rationally to questions.

Approximately six or seven days following the injury Dr. Aronoff commenced his routine burn treatment. This involved taking Dial twice daily on a cart to a tank of water solution and putting him in the tank. The burnt skin was then washed and "debrided". The debriding was done by nurses and consisted of pulling off the dead portions of skin with forceps. Many times this would require sedation by morphine prior to going into the tank because of the pain occasioned in the debriding operation. The debriding is necessary to prevent infection. Following the debriding his burns were covered with a sulfamylon cream. This cream contains acid and burns a great deal. Dial was not able to

tolerate the side effect of burning, and after a while Dr. Aronoff had to change to a terramycin cream. The debriding procedure is so extremely painful that patients undergoing the treatment begin to hate their nurses and doctors. They try to control themselves for a while but eventually they tend to break and an emotional breakdown is not uncommon in this situation.

Dial then developed a full thickness or third degree loss of the skin on his forehead, lost the outer two-thirds of his left eyebrow completely, and lost the skin of his left upper eyelid. The skin over the nose and especially the left half of the nose was deeply burned. A great portion of his upper lip was deeply burned as was his chin.

On September 3, 1971, almost a month after the accident, Joe Dial was taken to surgery under general anesthesia and an intermediate skin graft was made. An intermediate thickness skin graft is an area of skin which is 15/1000 of an inch thick. It was taken from the patient and applied to the burned raw areas of his left upper and lower eyelids, his left cheek, his forehead and his nose. The grafts took quite well with no significant loss of the grafts. Dial was kept in the hospital for ten days following this surgery. Dr. Aronoff then felt it was necessary to release Dial from the hospital as soon as possible because the benefits gained in regard to his burns by staying in the hospital were being greatly outweighed by the emotional deterioration that he saw. Dial felt as if he were in a jail and that the nurses who took him to the tank twice a day were torturing him. Because of this emotional deterioration, Dr. Aronoff felt that it would be better if Dial had some raw ungrafted areas on his body to be treated in his office rather than in a hospital.

After he was discharged from the hospital Joe Dial commenced office visits to Dr. Aronoff. Dr. Aronoff observed large red healed areas on Dial's back and neck and found that they bothered him a great deal because they were tender, painful and

itched a great deal. Drugs are sometimes used to sedate the patient, but it is usually impossible to control the itching. He further noticed that Joe Dial was developing an ectopia of the left lower eyelid, which is a drawing down of the eyelid. The result of this ectopia was an exposure of the eyeball. Subsequently, this happened to the upper eyelid exposing the upper eyeball. Shortly thereafter the doctor discovered that Dial was a "keloid scar former." This meant that the scars grew beyond their original confines. They became raised up above the level of the skin and invaded normal skin. The scars appeared bright red and when touched turned white from the acute inflammatory response. The scars began to tighten up into a tight band and drew his normal tissues out of configuration.

Dial also developed a severe contracture of the upper lip due to his keloidal scar tendency causing it to be drawn up and everted so that it was turned inside out. This interfered with his saliva control and eating.

On September 27, 1971, Dr. Aronoff noted that Joe Dial was very upset emotionally and psychologically. He further noted that Dial's whole life appeared to have been shattered by the accident. Dial's condition seemed to suddenly dawn upon him, and he had a very severe emotional breakdown, especially when told by Dr. Aronoff that he would have to go back into the hospital for more grafting of his eyelids and lip.

Dial was readmitted to the hospital on October 5, 1971, for a skin graft and to release the contractures of his upper lip and eyelid. This was done under local anesthesia. A full thickness graft was taken from the left postauricular area, which is the area behind the left ear, and this was applied to the defect of his left upper eyelid and to the defect created on the lip. He was kept in the hospital until October 12, 1971. When the sutures were removed from his graft it appeared that the doctor's purpose had been accomplished and the patient was able to close his eye and mouth.

As the skin grafting continued, however, further difficulty was encountered. Because of Dial's keloidal scar tendencies the donor sites also developed keloidal scars.

On October 24th, Dial was admitted to the hospital for a four-day stay. At that time the doctor was concerned with the left lower eyelid and again noted that it was beginning to contract quite severely. The doctor stated that because of the keloidal scar tendency he could not nonchalantly decide to do a split thickness graft on any given area to correct the problem, since he would be creating another problem at the donor site. He therefore had to consider that in order to cure one problem he was creating another and taking a like risk. A graft was performed on Dial's upper left eyelid. On November 15, 1971, Dr. Aronoff noted that the grafts were doing well but that the contracture around the mouth and the scars were getting worse. The lower lip was being drawn down and the inner corner of the left eye was beginning to contract. Dial also developed an abscess in the upper lip where the doctor had placed a graft, and this had to be drained. Dial was again admitted to the hospital on December 1, 1971, and surgery was performed under local anesthesia. The scar contracture around the corner of his mouth and upper lip was cut out completely, allowing his mouth to return to a normal configuration.

In January of 1972, Dial developed a severe contracture of the nose and corners of his left eye. He was admitted once again to the hospital for the purpose of grafting. Two-thirds of the skin of his nose, the corner of his eye, and the adjacent cheek on the left side were excised completely and a split-thickness graft was taken from the inside of his right arm. No attempt was made to correct the distortion of the nose at that time. The graft took well and the corners of his eyes improved considerably compared to their former condition. The donor site of the inside right upper arm became red, raw, tender and raised above the level of

the surrounding skin and became quite a problem. An attempt was made to treat the keloidal scars by injections of cortisone and steroids. On two occasions his neck scars were injected because they were beginning to contract quite severely.

At this point Joe Dial had grafts all over the left side of his face and was going to need, in the words of Dr. Aronoff, ". . . an awful lot of treatment further." The doctor had a neck splint fashioned for Dial to keep his neck straight up in order to avoid a contracture of the skin on the left side of his neck which would have contracted down and become deformed if the splint were not worn.

Since the scars on Dial's nose and the corners of his eyes still presented a problem, Dr. Aronoff made a model of Dial's face, a moulage. From this moulage the doctor fashioned a mask made of orthoplast, a malleable material. This mask was worn to keep pressure on the scars, with experience showing that such pressure on keloidal scar tissue does tend to have some beneficial effect. The mask looks like a white Halloween mask with eyes cut out. Pressure was also applied on Dial's arms in the form of Ace bandages. The bandages were wrapped around his arms continuously, with intermittent spells, in order to keep pressure on the scars. Due to the scarring on his right arm, the arm drew up and could not be straightened out. This will leave Dial with a permanent limitation of the arm. When asked about future skin grafts the doctor testified that there were no good donor sites on Joe Dial due to his keloidal scar tendency but that risks would have to be taken.

Dr. Aronoff's opinion is that Joe Dial has a normal life expectancy, but will experience a great deal of pain and suffering in the future as he has in the past. There is no doubt that Dial will suffer for the rest of his life as a result of the accident. He will need at least six future surgical procedures and possibly many more. The procedures will necessitate hospitalization.

In addition to the gross deforming scars and changed structures of his face, Dial has problem areas on his back, arms and legs. Even if these areas improved with time, they have the tendency to be more easily injured than normal tissue, since these tissues do not have the natural defense mechanisms of normal skin. Scar tissue, particularly, does not have the ability to secrete subcutaneous material, normal sweat material. On Joe Dial all these glands and glandular structures have been destroyed by fire. These tissues are susceptible to infection or trauma or injury and do not have their normal elasticity. The blood supply to the tissues is not good. Skin cancer sometimes occurs in burn scars. The type of cancer, marjilons ulcer, is usually more severe than the average type of skin cancer that individuals get on their forehead or face. The danger of this skin cancer is a very significant feature in Joe Dial's future. Dr. Aronoff has advised Dial to stay out of the sun and to protect his skin with oils and lubricants. This will have to be done for the rest of his life. Dr. Aronoff also told him to leave this part of the country for the northwest where he will not experience extremes of cold or heat.

Dr. Aronoff plans to reconstruct one eyebrow and hopes to give Dial a little better skin coverage so that with time some of the scarring process will subside. But no matter what Dr. Aronoff does his opinion is that Joe Dial is going to be permanently deformed and grotesque. Oils and greases must be continually applied to his skin to prevent drying. Dial must avoid all injury to the scarred areas from stimuli such as excessive heat, excessive cold, chemical irritants, irritant oils or irritant detergents. The scarred area on his face has diminished sensation and he has a severe lack of motion in the face itself. He is unable to smile because the burned portions of his face are almost rigid. Although new eyelids have been made for him, his blink reflex is slower than that of a normal person. Dr. Aronoff testified that because of the scarring, Dial's mouth

is much smaller than it was previously, and will not return to its normal size. Most of the hair follicles on his face are permanently destroyed and he will not be able to grow a beard or mustache in order to cover up his scar tissues. He also has a high statistical risk of having epileptic seizures because of the scar tissue that has formed in his brain.

As a result of the accident Joe Dial has suffered permanent brain damage. He is "frontal lobish." As opposed to his former quiet demeanor he is now facetious, garrulous, gives inappropriate responses and has mood-swaying periods. At one moment he might be joking and the next be bellicose. His actions are now childlike, characterized by great bursts of enthusiasm and great bursts of anger. Small things bother him and he is unable to control his emotions. When he gets depressed he cries.

When Dial first talked to Dr. Aronoff about his injuries he would not admit that he was badly injured. When he finally realized the extent of his injuries be became depressed. He feels that children make fun of him and that he is an object "to be looked at." During the last few months he had not been taking the strain well and his condition was "literally getting to him." Dial is clumsy. He falls over backwards while tying his shoes in a crouched position. That he does not have the control over his body that he used to makes him very unhappy. Prior to the accident Joe Dial had been offered a job in the department of neurophysiology at the University of Arizona. Since the accident Dial stays at home most of the time and everything seems to upset him. He is unhappy a lot of the time, but especially at night when his skin itches and he is unable to sleep. He is also unhappy because he cannot open his mouth very wide and cannot eat normally as he did before the accident.

Dr. Aronoff has noticed that Dial's responses are inappropriate. For instance he smiles at the wrong time and cries at the wrong time. While the face mask was being made, which is not a painful proce-

dure, Dial broke out crying in the middle of the procedure.

Since the accident Joe Dial's reading ability has been impaired. He cannot read as fast as he used to because he has trouble organizing ideas and remembering what he just read.

Dial was an attractive man before the accident. He now spends a lot of time in front of the mirror looking at himself. Lately he has been going to the cafeteria at the University of Arizona at an hour when it is not crowded because he does not want to be there with other people. Recreational activities in which Joe Dial engaged prior to the accident have been impaired. He has had to change his mode of dress and must now wear soft, light-weight clothing. He must apply creams and greases to his body continually. He has trouble with infections in his grafts which have to be drained. Whereas prior to the accident he was full of energy, he now tires easily.

Dial's ability to think creatively and to apply knowledge to problems has been impaired, as well as his ability to be tactful and considerate in social relationships. He faces a probability of skin cancer and is aware of this. He faces a certainty of future surgery and the possibility of additional surgery depending on the outcome. His appearance is very different from what he looked like before and he knows that people are repulsed by him. He is afraid to show his face in public places because he has experienced being pointed, stared and laughed at by children and adults. He feels that he looks grotesque and his self-concept, based on his appearance, has been extremely changed. His life is completely different now. His former plans are in essence ruined and he is beginning to realize this. Almost all the things that were important to him, professionally and recreationally, he cannot now do. He is very concerned about his ability to support his family. He is concerned about his ability to work in general, and wonders about his ability to be an engi-

neer. He wonders if anyone would hire him, considering his appearance. He is tense, and has lost confidence in himself. In spite of all this, however, Dial was struggling to keep going. He needs psychiatric care now and will probably need this for a few more years. It is possible that he could break down and require hospitalization. Dr. Aronoff believes that at this point Dial is "walking on very thin ice emotionally." He is coping with the situation as best he can, but part of this ability to cope requires that he not think of the full implications of his injury. He will not be able to avoid reality forever. Dial's view of his situation may become better, but when the time comes that he seeks a job and his situation dawns on him, he may very well become overwhelmed, go into an extremely deep depression, and require hospitalization.

Some of Dial's problems are strictly emotional. Not only does he have difficulty in the thinking process, but he has accompanying feelings about this difficulty. He has to cope with the fact that all of his former plans are now impossible. He has to cope with the fact that he looks grotesque. His appearance embarrasses him and he wishes his face was not visible when he is with people. He wonders how his family feels towards him. He cannot play with his daughter as he used to for fear of injury to the skin grafts. At the time of the trial he was using the defense mechanism of denial in order to cope with his problems.

His sexual relationship with his wife has changed greatly, as he is afraid that he is repulsive to her. If he follows Dr. Aronoff's advice and moves to a new community, he will have great difficulty in establishing social contacts due to his appearance. Prior to the accident David Hudnall and Joe Dial ate lunch with their associates, but Dial has told Hudnall on several occasions that he does not want to eat lunch with them now because he does not want to spoil anyone's appetite. He is quite conscious of the way he looks and his appearance seems to be the center of his world now.

Dr. Johnson has noticed that Dial's personality has changed since his accident. Specifically, Dial cannot carry on a conversation without forgetting the train of thought. He cannot concentrate and forgets what was being discussed. He sometimes forgets the names of people he knows and forgets the names of common objects such as a note pad. In the middle of a conversation he discusses the subject of his disfigurement. Whereas prior to the accident he was a very easy person to get along with, easy to talk to and a very likeable person, he now appears to Dr. Johnson to be very strange, unable to relax and very conscious of the way people look at him. He does not have the same store of knowledge that he had before the accident. In fact, he has difficulty recalling the basic principles of the very instruments he designed. Before the accident Dr. Johnson wanted very much to have Dial in his department. He would have permitted Joe to teach in the department, however, since the accident he does not believe it would be in the best interests of the students for Dial to teach because of his appearance.

Dr. Stewart testified that since the accident Joe Dial has changed and he would not employ him today. Dial cannot be trusted with laboratory machinery because of his inability to remember. He cannot continue in his chosen field of electrical engineering.

On August 6, 1971, the date of the accident, David Hudnall and his wife Patricia, had been married approximately eight years and had a three year-old son. Hudnall received a master of science degree in electrical engineering from the University of Florida. He worked with Joe Dial providing electronic support for the chairman of the department of physiology. As did Joe Dial, he helped design and make instruments for Dr. Johnson in the field of microcirculation.

At the time of the accident David Hudnall and his family had been living in Arizona for approximately a year and a half. He had become involved in hiking and had joined a hiking club. The family went on camping trips together and David was a member of the Southern Arizona Rescue Association. David Hudnall's big passion was the out-of-doors, hiking and camping.

When rescued from the burning vehicle, Hudnall was conscious but incoherent and kept repeating, "Get me out of here." He was brought to the emergency room with Joe Dial. He had extreme burns on his neck and had second and third degree burns on his shoulder, arm, hand, left thigh, right upper thigh, right chest and right loin area. He was taken to the Burn Unit, treated for shock and was given intravenous morphine and fluids. A catheter was placed in his bladder to monitor his output and determine whether his kidneys were functioning. He was in the hospital for 58 days and went through the same tanking and debriding procedure as Joe Dial. Hudnall's pain threshold was lower than Joe Dial's and he suffered extreme pain and agony. He could hardly be moved because of the pain. He was conscious of his injuries and was aware of everything that had happened to him. He understood the severity of his injuries and was afraid his life was ruined. He thought that he was going to lose his right arm, despite the doctor's reassurance that this was not so.

The tanking and debriding procedure was especially painful to Hudnall. He shivered and shook uncontrollably when lifted out of the water until he warmed up. The use of morphine was necessary to relieve his pain. The white cream used by the hospital personnel burned continuously from the time it was applied until the next tanking. There were many times during the tanking procedure that he was quite disturbed, could not bear the pain and apologized to the nurses for not being able to take such pain.

His arm now does not straighten out as it used to and the flexion is limited. He has daily pain and discomfort, especially when he moves his arm. This makes sleeping difficult. Hudnall will experience pain and suffering in his upper right arm for the rest of his life.

Because of the danger of injuring his skin grafts, there are certain tools that he used on his job that he is unable to use now. Furthermore, he is unable to play with his son as he did in the past since he is afraid to injure the grafts. His backpacking activities and his outings with the Southern Arizona Rescue Association are now at an end since the doctor has warned him that he cannot receive any kind of trauma to the grafts. The grafted areas of his skin have some of the same infirmities as Joe Dial's in that they do not have the inherent defense mechanisms of normal skin and there is a tendency to infection and irritation.

Although he has had three graft operations to date, Hudnall will probably need ten more operations during the remainder of his life. It is necessary for him to be seen by the doctor at least every three months to assure that there is no irritation of the scars which might lead to skin cancer.

It was stipulated at trial that Hudnall's life expectancy is 41 years and the life expectancy of Joe Dial was stipulated to be 39 years.

At trial both Dial and Hudnall exhibited the burned areas of their body to the jury while wearing bathing suits.

The defense called no witnesses.

Appellants claim that appellees' counsel was guilty of misconduct in his summation to the jury. The record discloses that appellants made no objection to the alleged prejudicial statements when they were made, nor did they move for a mistrial at the conclusion of the closing statements prior to a summation of the case to the

jury. The first time that the alleged misconduct was brought to the attention of the trial court was on the motion for new trial.

In Bruno v. San Xavier Rock & Sand Company, 76 Ariz. 250, 263 P.2d 308 (1953), the court stated:

" ' . . . if appellant deemed the argument so prejudicial as that neither an explanation or withdrawal by counsel, nor an instruction by the court, would have rendered the argument harmless, request should have been made to withdraw the case from the jury and discharge the panel. We do not think a litigant should be permitted to lie in wait, take chances on a favorable verdict and, being disappointed, sally from ambush and, for the first time, complain of an improper argument in the motion for a new trial.' " 76 Ariz. at 254, 263 P.2d at 311.

In the case of Beliak v. Plants, 93 Ariz. 266, 379 P.2d 976 (1963), the court stated:

" . . . It is asserted generally that defendant's argument, 'among other things, consisted of accusations, wholly unwarranted by the evidence, that the plaintiff, his family, his witnesses and his counsel misrepresented evidence and presented false evidence in order to fraudulently deceive the jury.' We think the answer to this assignment lies in the fact that the plaintiff did not make an objection to the argument before the case went to the jury. Misconduct in the closing argument was first raised in the trial court on plaintiff's motion for new trial. Our announced rule is that unless misconduct is so serious that no admonishment could undo the damage, the failure to make timely objection is a waiver of error."

In Collins v. Dilcher, 104 Ariz. 221, 450 P.2d 679 (1969), the court quoted favorably from both Bruno v. San Xavier Rock and Sand Company, supra, and Beliak v. Plants, supra, and stated:

"Since plaintiffs did not raise these questions before a motion for new trial, they have waived them and, as we have repeatedly held, we will not give a litigant a second chance to win on an error which was not called to the trial court's attention in time to permit its correction."

We have read the remarks of counsel of which appellants complain and do not believe the misconduct, if there was any, was so serious that no admonishment could undo the damage. As was stated by the court in City of Prescott v. Sumid, 30 Ariz. 347, 247 P. 122 (1926):

"Remarks made by counsel in the heat of argument are always taken by reasonable men '*cum grano salis*,' and when their impropriety is called to the attention of the jury by the court, it is but *rarely* that harm results." (Emphasis added.)

Appellants' argument that this case should be reversed because of erroneous and prejudicial instructions to the jury is equally without merit. Before a party may assign as error the giving of an instruction he must first object by stating distinctly the matter to which he objects and the grounds of his objection. Rule 51(a), Ariz.R.Civ.P., 16 A.R.S. Appellants made no such objection prior to the giving of the instructions complained of and have therefore waived any objections.

The main thrust of appellants' appeal concerns itself with the size of the verdicts. Appellants assert that the economic loss and pecuniary loss to Joe Dial could not have been and will not be more than $1,000,000, and the pecuniary loss, past and future, for Hudnall will not amount to more than $45,000. Therefore, appellants conclude that awarding the sum of $2,500,000 to Dial for past and future pain and suffering and $350,000 for past and future pain and suffering to Hudnall is shocking, extravagant and indicative of a

verdict motivated by passion and prejudice and not by the evidence.

Citing Stallcup v. Rathbun, 76 Ariz. 63, 66, 258 P.2d 821, 824 (1953), appellants urge that the size of the verdicts alone in this case show that the jury was actuated by passion and prejudice. In Stallcup v. Rathbun, supra, the court stated:

> " ' * * * "The damages . . . must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line, for they have no standard by which to ascertain the excess." ' "

Citing the case of Moran v. Zenith Oil Co., 92 Cal.App.2d 236, 206 P.2d 679 (1949), appellants maintain that in order to judge the outrageousness of the verdict the true value of the sum is to be determined by its power to obtain the necessaries of life. In this regard appellants point out that if Joe Dial put his 2.5 million dollars for pain and suffering into tax-free municipal bonds paying 6% interest, his annual yield would be $150,000 or $12,500 per month for non-economic loss. This, appellants maintain, is socially unacceptable because (1) it creates a personal fortune at the expense of another individual, (2) there must be a reasonable limit as to what can be expected, (3) society is not compensating war casualties who have sustained equal or worse injuries, and (4) if Dial had been injured on the job he would not have received any award for pain and suffering under the Workmen's Compensation laws of this state. Appellants have attached to their opening brief an appendix containing what they call "comparative verdicts" and suggest that we look at these other verdicts in deciding whether or not the verdict in this case was outrageous.

We first note that Moran v. Zenith Oil Co., supra, involved a case wherein the appellant complained that the verdict was excessive. In rejecting this proposition the California court noted that the current value of the dollar precluded a comparison of the jury verdict for personal injuries with amounts allowed for similar injuries in pre-war days. The court cited several cases which stand for the proposition that a jury, in making its award, may consider the decrease in the purchasing power of the dollar. We know of no cases, and the appellants have cited none to us, which hold that the jury is to determine its award for pain and suffering by determining a lump amount which, when invested, will result in an annual amount which is at once just and reasonable. Nor have we found any cases which hold that the court is to determine whether an amount is excessive by determining its annual yield. This court also realizes that the true amount of the award which appellees will eventually receive is somewhat less, considering deductions for attorney's fees, expert witness fees, and other costs.

Appellants state that "it behooves us to pause and make a thoughtful inquiry into the magnitude of a burden that we ask society to shoulder. It seems apparent that we would never have permitted our tort law to reach a point where a single individual would have the burden of paying in excess of $2.5 million for *non-economic losses* claimed as a result of one auto accident." As we understand appellants' argument, when a wrongdoer injures an innocent party, the focus should be on the ability of the wrongdoer to pay rather than on the injuries of the innocent. We do not agree with this contention. When the question is who should suffer, the innocent party or the wrongdoer, our society mandates that the suffering should be borne by the wrongdoer and not the innocent person.

Making references to verdicts in other cases, from our own jurisdiction or others is a dangerous game, to say the least. No two persons are alike. No two injuries are

alike. No two juries are alike. We hope the day will never come when awards for pain and suffering in personal injury suits are based upon pre-determined schedules. The worth and dignity of the individual is a touchstone of our society.

If anything is to be considered "socially unacceptable" it would be for an individual worngfully injured by another to receive less for pain and suffering than that amount to which he is entitled.

The initial responsibility for reducing an excessive verdict is with the trial court. Braun v. Moreno, 11 Ariz.App. 509, 466 P.2d 60 (1970). We note that the trial judge who refused to grant a remittitur in this case is no novice in the trial of personal injury cases. He is a highly regarded trial judge in this state with vast experience in the trial of personal injury lawsuits. In McClain v. Sinclair, 2 Ariz.App. 543, 410 P.2d 500 (1966), this court noted that the jury and the trial judge have a much better opportunity than do appellate judges to measure the actual damage suffered by plaintiffs and the amount which would compensate for their injuries. The trial judge not only has the opportunity to hear and observe the evidence in the case but is also singularly able to observe the jurors in considering whether or not they were motivated by passion or prejudice in their verdict.

Where the trial court has refused to interfere with the jury's determination of damages, this court cannot interpose its own judgment on the issue unless convinced that the verdict is so outrageously excessive as to suggest, at first blush, passion or prejudice. Braun v. Moreno, supra.

After a reading of the transcript and a review of the evidence, our conscience is not so shocked.

Affirmed.

KRUCKER, C. J., and HATHAWAY, J., concur.