## PIPPEN v DENISON DIVISION OF ABEX CORPORATION

OPINION OF THE COURT

1. PRODUCTS LIABILITY—MANUFACTURER'S LIABILITY—ELEMENTS.

The plaintiff in a products liability suit against the manufacturer of an industrial power press must allege and prove that (1) the press was transferred from the manufacturer's possession while in a defective state and (2) as a result of being defective, the product caused personal injury or property damage.

2. PRODUCTS LIABILITY—EVIDENCE OF DEFECT—CIRCUMSTANTIAL EVIDENCE.

Proof that a product is defective can be drawn from circumstantial evidence without a showing of a specific demonstrable defect.

3. EVIDENCE—CAUSATION—CONJECTURE RULE.

A case based upon an injury that cannot be accounted for will

REFERENCES FOR POINTS IN HEADNOTES

[1] 63 Am Jur 2d, Products Liability §§ 5–24.
Liability of manufacturer or seller for injury caused by industrial, business, or farm machinery, tools, equipment, or materials. 78 ALR2d 594.

[2, 3] 30 Am Jur 2d, Evidence § 1091.

[4] 63 Am Jur 2d, Products Liability §§ 71, 72.
Manufacturer's or seller's duty as to product design as affecting his liability for product-caused injury. 76 ALR2d 91.

[5] 5 Am Jur 2d, Appeal and Error § 837.

[6, 7] 5 Am Jur 2d, Appeal and Error § 943.

[8] 5 Am Jur 2d, Appeal and Error § 772.

[9] 22 Am Jur 2d, Damages § 110.
Per diem or similar mathematical basis for fixing damages for pain and suffering. 60 ALR2d 1347.

[10] 22 Am Jur 2d, Damages §§ 26, 87.
Duty to instruct, and effect of failure to instruct, jury as to reduction to present worth of damages for future loss on account of death or personal injuries. 154 ALR 796.

[11] 22 Am Jur 2d, Damages §§ 366, 367.
Constitutional or statutory provision forbidding re-examination of facts tried by a jury as affecting power to reduce or set aside verdict because of excessiveness or inadequacy. 11 ALR2d 1217.

fail for want of proof where the cause of the injury rests wholly in conjecture; however, this rule should not be extended to deny an injured person a right of action where there is room for balancing the probabilities and for drawing reasonable inferences that are better supported upon one side than the other.

4. PRODUCTS LIABILITY—BREACH OF WARRANTY—EVIDENCE—AGE OF PRODUCT—SEALED CONTAINER—JURY.

The evidence in a products liability case arising out of an injury caused by a malfunctioning power press was sufficient to support the plaintiff's theory that a defect in the press existed when it left the manufacturer's possession where there was evidence that (1) the press was relatively new when the accident occurred and (2) the control mechanism of the press, which must have caused the malfunctioning, was located in a sealed container; therefore, the trial judge did not err by instructing the jury on plaintiff's theory of a breach of warranty in the design and manufacture of the press.

5. JUDGMENT—REMITTITUR—JURY VERDICT—EXCESSIVENESS.

*Remittitur* is the procedural process by which a jury verdict is diminished by subtraction; in a typical case, a plaintiff is given an election to remit a portion of the jury verdict or submit to a new trial, after the defendant has moved for a new trial because of an excessive verdict.

6. JUDGMENT—REMITTITUR—PERSONAL INJURY CASE.

*Remittitur* can be ordered only if the jury verdict is so excessive as to shock the judicial conscience, and courts are particularly reluctant to disturb jury verdicts in personal injury cases because there is no absolute standard by which damages in personal injury cases can be measured.

7. JUDGMENT—JURY VERDICT—PERSONAL INJURY CASE—SETTING ASIDE VERDICT.

A jury verdict in a personal injury case should not be set aside as long as the amount awarded is within the range of the evidence and within the limits of what reasonable minds might deem just compensation for such imponderable items as personal injuries and pain and suffering.

8. APPEAL AND ERROR—REMITTITUR—ABUSE OF DISCRETION.

A trial judge's order of *remittitur* will not be reversed on appeal unless the trial judge abused his discretion; however, appellate courts have not been slow to find an abuse of discretion where

the verdict was within the range of, and supported by, the proofs.

9. DAMAGES—PER DIEM FORMULA—PAIN AND SUFFERING—LOSS OF CONSORTIUM.

A per diem formula may be used to calculate damages for pain and suffering and loss of consortium.

DISSENT BY J. H. GILLIS, P. J.

10. DAMAGES—FUTURE DAMAGES—INFLATION—PRESENT WORTH—INSTRUCTIONS TO THE JURY.

*A jury may consider the effect of inflation when determining lost wages; however, a trial judge should instruct the jury to reduce an award for future damages to present worth.*

11. NEW TRIAL—DAMAGES—VERDICT—EXCESSIVENESS—REMITTITUR—COURT RULES.

*In a suit by a 67-year-old man and his spouse for damages for the loss of an arm, a new trial should be granted because of the shocking excessiveness of the jury verdict where the verdict was $1,750,000, where the trial judge believed the verdict was prejudiced and ordered over a $1,000,000 remittitur, where the amount awarded for pain and suffering is more than twice that approved by any other appellate court in the country, and where the verdict amounts to some $80,000 per year for pain and suffering over the remaining life expectancy of the plaintiff husband (GCR 1963, 527.1[3]).*

Appeal from Wayne, George E. Wicklund, J. Submitted October 9, 1975, at Detroit. (Docket No. 19817.) Decided January 26, 1976. Leave to appeal applied for.

Complaint by John and Evelyn Pippen for damages for loss of an arm in an industrial accident. Jury verdict of $1,750,000 for plaintiffs. The trial judge found the verdict to be excessive, but denied a motion for a new trial on the condition that plaintiffs agree to remit $1,000,000 of the verdict. Plaintiffs agreed. Defendant appeals. Original verdict reinstated.

*Rains, Block & Dean* and *Zeff & Zeff,* for plaintiffs.

*Davidson, Gotshall, Kohl, Nelson, Secrest, Wardle & Lynch* (by *Konrad D. Kohl* and *Wayne D. Gardner),* for defendant.

Before: J. H. Gillis, P. J., and Bronson and T. M. Burns, JJ.

Bronson, J. On October 25, 1970, plaintiff John Pippen was injured while operating a hydraulic power press for Atlantic Die Casting Company. He brought suit against the manufacturer of the press, Denison Division of Abex Corporation, alleging breach of warranty in the design and manufacture of the press. He also claimed negligence in the design of the press and in the failure to warn the user of the press of potential dangers. John Pippen's wife, Evelyn, sued for loss of consortium. The jury returned a verdict in favor of John and Evelyn Pippen in the amounts of $1,250,000 and $500,000, respectively. The trial judge found the verdict to be excessive, but denied a motion for a new trial on condition that the plaintiffs each remit part of the verdict. Plaintiffs agreed, and judgment was entered for $625,000 and $100,000, respectively.

The press in question was used to trim excess metal from die castings, and had been sold to Atlantic by Denison in October of 1966. The press was equipped with dual "palm buttons" as a safety device. These buttons are located on each side of the machine, to keep the operator's hands out of the dangerous area of the press. Both buttons must be pressed before the "ram" comes down, cuts the metal from the castings, and returns to its

original position. The center piece of casting remains to be removed by hand.

In theory, the press does not cycle again until both palm buttons are released and pressed down again, thus protecting the operator's hands. On the night in question, however, as plaintiff reached in to remove the casting, the press repeated its cycle without plaintiff having pressed the palm buttons. The ram caught his arm and crushed it. The doctors treating his injuries were required to amputate his arm above the elbow. The press again "repeat cycled" after Mr. Pippen was injured.

At trial, plaintiffs presented no direct evidence to identify a particular part of the press that failed, causing the press to "repeat cycle". However, plaintiff's expert witness testified that the only possible area of failure was in the control mechanism, sealed in the control box of the press. Indicating that this press was "relatively new", since a press normally operates for 30 to 40 years, the expert felt that a sticking relay valve or malfunctioning solenoid were the most likely causes of the press "double tripping". The expert found the press design to be defective because the electrical circuitry of the control box would not prevent the press from cycling upon failure of either of those two parts. The plaintiff's expert also testified that the press was defective, in that there were insufficient safety features designed into the press which were available at the time, *i.e.,* a safety block.

Defendant did not contest the fact that the press "repeat cycled". Instead, Denison's expert witness, after an inspection of the press several days after the accident, put forth two alternative theories as to the cause of the malfunction. First, metal fragments had entered the control box because the

control box had been opened and improperly resealed. Second, Denison alleged that a substitute palm button had been opened and not properly resealed. The trial judge allowed that testimony into evidence only upon the condition that defendant show that these conditions existed on the date of the accident, and were not caused by the employer's investigation of the accident. Defendant never introduced any evidence showing those facts.

Defendant raises numerous issues upon appeal, but we find only two merit discussion: (1) whether the trial judge improperly instructed the jury on an implied warranty cause of action because plaintiff failed to show a "defect" existed in the press; and (2) whether the amount of damages awarded both before and after *remittitur* were excessive.

## I. *The Warranty Instruction*

In order to recover from Denison for breach of an implied warranty, the plaintiff must allege and prove that (a) the press in question was transferred from the manufacturer's possession while in a "defective" state and (b) as a result of being "defective", the product caused personal injury or property damage, *Piercefield v Remington Arms Co, Inc,* 375 Mich 85; 133 NW2d 129 (1965). The proof that a product is defective can be drawn from circumstantial evidence without a showing of a specific demonstrable defect, *Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965).

Defendant expresses agreement with those legal statements, but contends that plaintiff's theory that the press malfunctioned as a result of a "defect" was "mere conjecture", citing *Kaminski v Grand Trunk W R Co,* 347 Mich 417; 79 NW2d 899 (1956). Defendant's theory that the press was improperly maintained and modified by plaintiff's employer is said to be equally as probable as

plaintiff's theory as to the cause of the malfunction. Defendant argues that, under the *Kaminski* rule on circumstantial evidence, there is insufficient proof of causation to go to the jury. On its face, that argument is persuasive, yet we find that it does not comport with recent Michigan products liability law.

The *Kaminski* case does set forth important rules governing the use of circumstantial evidence. There, plaintiff was injured by a metal cart while he was working at a General Motors plant near certain railroad tracks. Plaintiff sued Grand Trunk, contending that a train owned by that company had negligently knocked the cart into plaintiff. It was dark at the time of the accident, so there was no direct evidence that the train had hit the cart. Grand Trunk claimed that plaintiff had proven only that the accident occurred, and that non-negligent explanations of the cause of the accident were equally as probable as the plaintiff's theory. Defendant, then, argued on appeal that its motion for a directed verdict should have been granted.

The *Kaminski* Court reiterated the "conjecture" rule as being applicable to the case:

"  'As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only.' " 347 Mich at 422.

Yet the Court went on to state that if proven facts support plaintiff's theory, viewing them most favorably to plaintiff, the case can go to the jury. Looking to the particular facts, the Supreme Court

found defendant's theories to be of "comparative improbability" in relation to the inference of negligence plaintiff wished to draw from the proven facts. The denial of a directed verdict was upheld.

The "conjecture rule" is quite narrow in its operation. As stated in the early case of *Schoepper v Hancock Chemical Co,* 113 Mich 582, 586; 71 NW 1081 (1897):

> "It is true that where an injury occurs that cannot be accounted for, and where the occasion of it rests wholly in conjecture, the case may fail for want of proof. *Robinson v Charles Wright & Co,* 94 Mich 283 [53 NW 938 (1892)]; *Redmond v Lumber Co,* 96 Mich 545 [55 NW 1004 (1893)]. But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action where there is room for balancing the probabilities, and for drawing reasonable inferences better supported upon one side than the other."

Illustrative of the judicial philosophy of searching for factual support for plaintiff's theory is the case of *Schedlbauer v Chris-Craft Corp,* 381 Mich 217; 160 NW2d 889 (1968). Plaintiff's pleasure boat was destroyed by a fire resulting from an engine room explosion. Plaintiff sued defendant for failing to warn boat owners that a diaphragm in the fuel pump could wear out and leak gas into the hold. The engine was not recovered. The Supreme Court held that plaintiff's testimony that the engine began to run "rough" shortly before the explosion and that it continued to run after the explosion made plaintiff's theory more likely than defendant's.

In reviewing the Michigan cases in this area, we find that proof of certain facts has consistently been held sufficient to prevent a plaintiff's theory from being characterized as "mere conjecture".

Proof that a malfunctioning product is relatively new is frequently found to support an inference that a "defect" in the product caused that malfunction. See, *Snider v Bob Thibodeau Ford, Inc,* 42 Mich App 708; 202 NW2d 727 (1972) [Ford truck six months old]; *Garmo v General Motors Corp,* 45 Mich App 703; 207 NW2d 146 (1973) [Pontiac automobile four and one-half months old, driven about 8,000 miles]; *Bronson v J L Hudson Co,* 376 Mich 98; 135 NW2d 388 (1965) [clothing claimed to contain chemical irritants bought one day prior to injury]; *Caldwell v Fox,* 394 Mich 401; 231 NW2d 46 (1975) [Chevrolet automobile five weeks old]. A history of repair problems, traceable back to the time of purchase, associated with the malfunctioning part of the product has also been considered important. See, *Snider, supra* [brake problems soon after purchase continued for four months, until the accident]; *Garmo v General Motors Corp, supra* [car returned for brake problems several times soon after purchase].

Perhaps one of the most important factors is whether the part which fails is open and exposed, where it may be tampered with, or is sealed. In *Meli v General Motors Corp,* 37 Mich App 514; 195 NW2d 85 (1972), where the Court could find nothing to support the inference of a "defect", malfunctions inside a "sealed package" were distinguished:

"We are not confronted here with an enclosed part such as a brake mechanism or a fuel pump where it could logically be inferred that any defect was present when the automobile left the manufacturer. In cases where the defect is more or less in a 'sealed package', it is more plausible to believe that the defect was caused by the manufacturer than to believe that the package was opened after sale, the defect caused independently, and then the package resealed." 37 Mich App at 519.

That concept seemingly has been recognized *sub silentio* in several cases involving malfunctioning brake systems. See, *Snider, supra, Garmo, supra,* and *Caldwell, supra.*

In the present case, two of those three important factual patterns were shown to exist. The press was characterized as "relatively new" by plaintiff's expert, and that view was supported by the record. Secondly, there was direct testimony that the only part that could malfunction, the control mechanism, was located in a sealed container which had not been opened at the time of the accident. Defendant disputed that fact, but we must view the evidence most favorably to plaintiff. Under that standard of review, there was proof of the fact that the malfunctioning system was located in a closed box.

We conclude that the independent facts presented at trial lent sufficient support to plaintiff's theory of a "defective" product to take it beyond the stage of "mere conjecture". The trial judge committed no error by instructing the jury on a warranty theory.[1]

## II. *Excessiveness of the Damages*

The excessiveness of the damages awarded to plaintiffs in this case has been put directly in

---

[1] This author should point out that in *Kujawski v Cohen,* 56 Mich App 533; 224 NW2d 908 (1974), following *McKinch v Dixon,* 391 Mich 282; 215 NW2d 689 (1974), he found the following proof sufficient to go to a jury on a warranty theory: (1) that a malfunction in a product caused injury; and (2) that plaintiff's theory of a "defect" was *consistent* with the nature of the malfunction, although not more probable than defendant's theories.

The recent Supreme Court case of *Caldwell v Fox,* 394 Mich 401; 231 NW2d 46 (1975), seems to have retracted upon *McKinch* and to have followed the proof requirements set forth in the body of this opinion. However, since we hold that plaintiff's proofs were sufficient even under those stricter standards, we need not reach that issue here. We leave that question open, although it seems to have been addressed by another panel of this Court in *Holloway v General Motors Corp,* 60 Mich App 208; 230 NW2d 380 (1975).

issue. Defendant argues first that the $1,750,000 award was clearly excessive, and then that even the $750,000 judgment entered after *remittitur* is excessive. Plaintiffs, pursuant to GCR 1963, 527.6, argue that the original verdict was supported by the evidence at trial. We agree with plaintiffs, and reinstate the original verdict.

The use of *remittitur* by the trial judge is well-established under Michigan law. Broadly defined, *remittitur* is the procedural process by which a verdict of the jury is diminished by subtraction.[2] In the typical case, the plaintiff, on a motion by the defendant for a new trial because of an excessive verdict, is given an election to remit a portion of the amount or submit to a new trial. Where there are no other errors in the trial, *remittitur* can be ordered only if the verdict is so excessive as to "shock the judicial conscience", *Stevens v Edward C Levy Co,* 376 Mich 1, 4; 135 NW2d 414 (1965), *McKay v Hargis,* 351 Mich 409, 419; 88 NW2d 456 (1958), *Asmus v Barrett,* 30 Mich App 570, 578; 186 NW2d 819 (1971), *Powers v City of Troy,* 28 Mich App 24, 40; 184 NW2d 340 (1970).

Clearly, the trial judge is not empowered to go through *de novo* review of the verdict returned by the jury. The *remittitur* power should be exercised with restraint. The courts are even more reluctant to allow jury verdicts in personal injury cases to be disturbed. The rationale for that deference to the jury is found in the early case of *Watrous v Conor,* 266 Mich 397; 254 NW 143 (1934):

"There is and can be no absolute standard by which we can measure the amount of damages in personal injury cases. Individual opinions may differ as to the correctness of awards, even those made by trial judges. It has yet to be determined whether the judgment of a

---

[2] Carlin, *Remittiturs and Additurs,* 49 W Va L Q 1 (1942).

one-man jury is sounder than that of 12. * * * Adopting defendant's contention that, at best, the showing here is only one of pain and suffering, plus expenses for medical services and hospitalization attention, we still prefer our rule stated in the case of *Weil v Longyear,* 263 Mich 22 [248 NW 536 (1933)], that the amount allowed for pain and suffering must rest in the sound judgment of the trier of the facts. Assuming even that our verdict might be in a different amount, we are loath to disturb verdicts for personal injuries on the ground that the amount is excessive." 266 Mich at 401.

See also, *O'Grady v Rydman,* 347 Mich 606; 81 NW2d 383 (1957), *Cleven v Griffin,* 298 Mich 139; 298 NW2d 482 (1941), *Morgan v Engles,* 13 Mich App 656; 164 NW2d 702 (1968), *shirley v The Drackett Products Co,* 26 Mich App 644; 182 NW2d 726 (1970), and *Dillard v Braunstein,* 32 Mich App 216; 188 NW2d 203 (1971), for similar reasoning.

With the extra regard for the jury assessment in personal injury cases, the "shock the conscience" test becomes:

" 'As long as the amount awarded is within the range of the evidence, and within the limits of what reasonable minds might deem just compensation for such imponderable items as personal injuries sustained and pain and suffering, the verdict rendered should not be set aside.' " *Stevens v Edward C Levy Co,* 376 Mich 1, 5; 135 NW2d 414 (1965).

Once the trial judge has ordered *remittitur,* the test is whether he has abused his discretion, *Dougherty v Rezolin, Inc,* 48 Mich App 636; 210 NW2d 899 (1973). Yet the courts carefully scrutinize the trial judge's decision based upon the above-stated tests. The appellate courts have not been slow to find an abuse of discretion where the verdict was within the range of, and supported by,

the proofs. See, for example, *Stowers v Wolodzko,* 386 Mich 119; 191 NW2d 355 (1971), *Stevens, supra, Majewski v Nowicki,* 364 Mich 698; 111 NW2d 887 (1961), and *Soave Construction Co v Lind Asphalt Paving Co,* 56 Mich App 202; 223 NW2d 732 (1974).

The original jury verdict of $1,750,000 for plaintiffs was supported by the record, and does not "shock" our "judicial conscience". The plaintiff John Pippen testified as to intense pain and suffering from his injuries, and Evelyn Pippen told of the problems that had resulted to their relationship as husband and wife. Counsel for plaintiff argued from a per diem formula for pain and suffering damages and loss of consortium, a method specifically approved in Michigan, *Yates v Wenk,* 363 Mich 311; 109 NW2d 828 (1961), *Crenshaw v Goza,* 43 Mich App 437, 444; 204 NW2d 302 (1972). Defense counsel, for tactical reasons, did not argue the issue of damages to the jury.

We find that plaintiffs' testimony supported the per diem amounts suggested by plaintiffs' counsel. In light of today's economics, we cannot hold such amounts to be excessive as a matter of law. Using a perfectly proper mathematical formula, the suggested damage award was actually greater than the amount the jury returned. We think that this jury verdict which was in keeping with plaintiff's unobjected-to mathematical formula should not be set aside.

We must assume that the jury represented a cross-section of the community, with diverse experiences in life. It reached its unanimous decision after considerable deliberation. The jury had the benefit not only of listening to the testimony, but also close and extended observation of the plaintiffs and their relative vitality, energy, and seriousness of injuries.

Defendant attempts indirectly to "shock our judicial conscience" by emphasizing the size of the lump-sum amount. First, Denison argues that verdicts in other cases involving similar injuries have been less. We find the fact that a damage award is "precedent shattering" to be of little moment when the damages are in fact supported by the record, *Williams v Department of State Highways,* 44 Mich App 51; 205 NW2d 200 (1972).[3] Second, Denison argues that even the $725,000 minus plaintiffs' costs can be invested to give them an income of $35,000 per year without touching the principal. We find that contention to be fully answered in *Wry v Dial,* 18 Ariz App 503, 514; 503 P2d 979, 990 (1972):

"We know of no cases, and the appellants have cited none to us, which hold that the jury is to determine its award for pain and suffering by determining a lump amount which, when invested, will result in an annual amount which is at once just and reasonable. Nor have we found any cases which hold that the court is to determine whether an amount is excessive by determining its annual yield."

In conclusion, we find the damages awarded here to be within the fair scope of the evidence presented at trial. We are not persuaded by defendant's attempts to characterize the lump-sum amount awarded as some type of windfall to plaintiffs.

Remanded for reinstatement of the original jury verdict. Costs of this appeal to plaintiffs.

T. M. BURNS, J., concurred.

---

[3] We note in passing that in fact this verdict may not be out of line with recent verdicts in other cases. An award of $2,500,000 for pain and suffering has been upheld by one appellate court. *See, Wry v Dial,* 18 Ariz App 503; 503 P2d 979 (1972).

J. H. GILLIS, P. J. *(dissenting).* The jury verdict in the instant case is so shockingly excessive that I am compelled to conclude that a new trial is mandated.

At the time his arm was amputated, plaintiff John Pippen was 67 years old. He was a man of modest means,[1] he had a life expectancy of slightly less than 14 years. His wife Evelyn's life expectancy exceeded 14 years; she too was a woman of modest means. The jury awarded John Pippen $1,250,000; they awarded Evelyn Pippen $500,000.

The $1,250,000 verdict in John Pippen's favor encompassed lost wages, medical expenses, and pain and suffering. At trial, plaintiffs' counsel argued that John worked 55–60 hours a week, earned $2.65 an hour,[2] and that the jury could award him lost wages for his entire life expectancy *(i.e.* they could assume he would work until he was 81 years old). Accepting these arguments as true, our calculations indicate that Pippen was entitled to approximately $141,000 in lost wages.[3] His med-

---

[1] Prior to his employment as a press operator, plaintiff had (a) played piano at various Detroit establishments from 1927–1948, (b) been a utility floor man at US Rubber Co, (c) been an assembly worker at Chrysler Corp, (d) been a riveter at Hudson Motor Co, (e) been a porter at a jewelry store, (f) been a porter at Winkleman's, (g) been a shoeshine man at a barber shop, (h) received welfare and ADC from 1961–1968, and (i) received social security from 1962 on.

[2] Plaintiff's counsel informed the jury that Pippen was paid $2.65 per hour for the first 40 hours of a week, he was paid "time and a half" for the next 8 hours, and he was paid "double time" for any hours worked beyond the first 48 hours.

[3] On appeal, plaintiff argues that the jury was free to consider the effects of inflation in determining lost wages. *Normand v Thomas Theater Corp,* 349 Mich 50; 84 NW2d 451 (1957), and *Routsaw v McClain,* 365 Mich 167; 112 NW2d 123 (1961), support this contention. Equally true, however, is the fact that the trial judge must instruct the jury to reduce their award to "present worth", even in the absence of requested instruction by counsel. *Nagi v Detroit U R Co,* 231 Mich 452, 461; 204 NW 126, 129–130 (1925). The trial judge in the instant case neglected to instruct on either inflation or present worth. We will therefore assume that the two factors essentially cancelled each other out.

ical expenses were stipulated to be $1,791.25. His pain and suffering damages would therefore amount to $1,107,209.[4] Likewise, trial testimony indicated that Evelyn Pippen was required to relinquish a $1,200 per year job in order to care for her injured husband. Accepting this testimony as true, her lost wages amounted to approximately $17,000 for the 14-year period. Her award for loss of consortium, therefore, encompassed $17,000 for lost wages and $483,000 for loss of intangible benefits.

When the jury returned its verdict, the trial judge was shocked. He stated that the verdict was " * * * so gross as to carry its own obvious proof of prejudice on the part of the jury". Although he was empowered to grant a new trial on that basis alone,[5] he declined to do so. Rather he ordered John Pippen to remit $625,000 and Evelyn Pippen to remit $400,000. Thus, the jury verdict was diminished by almost 60%. It is in this posture that the case comes before us. Defendant claims the remitted verdict is still too large, plaintiffs claim that the $1,750,000 award is conservative in light of what the Pippens actually deserved. The majority has set aside the *remittitur* and reinstated the original verdict.

In reviewing the decision of a trial judge to either grant or deny a *remittitur,* we look to see whether there has been an abuse of discretion on his part. *Dougherty v Rezolin, Inc,* 48 Mich App 636; 210 NW2d 899 (1973). The reasons for this rather narrow scope of review are obvious. In *Wry v Dial,* 18 Ariz App 503, 515; 503 P2d 979, 991 (1972), a case relied on by the instant majority, the Arizona Court of Appeals succinctly enunciated the policy underlying a narrow scope of review:

---

[4] ($1,250,000)−($141,000)−($1,791)=$1,107,209.

[5] GCR 1963, 527.1(3).

"In *McClain v Sinclair,* 2 Ariz App 543; 410 P2d 500 (1966), this court noted that the jury and trial judge have a much better opportunity than do appellate judges to measure the actual damage suffered by plaintiffs and the amount which would compensate for their injuries. *The trial judge not only has the opportunity to hear and observe the evidence in the case but is also singularly able to observe the jurors in considering whether or not they were motivated by passion or prejudice in their verdict."* (Emphasis supplied.)

In the instant case, the trial judge specifically stated that he thought the verdict was prejudiced, and therefore ordered a huge *remittitur.* Yet the majority dismisses this fact by merely stating that courts will find an abuse of discretion in the ordering of a *remittitur* where the verdict is supported by the evidence,[6] that this verdict does not shock their conscience and is therefore supported by the evidence. Unlike the majority, I find the fact that the trial judge stated that the verdict was "prejudiced" and that he ordered a *remittitur* of approximately 60% to be of great significance. It plays a large part in my determination that a new trial is necessary.

In the absence of other error at trial, a jury award of damages is set aside only if it is so excessive as to "shock the conscience" of the reviewing court. *Stevens v Edward C Levy Co,* 376

---

[6] The majority cites five cases in support of the proposition that a *remittitur* will be set aside if the original verdict is supported by the evidence. This statement is obviously correct. It is interesting to note the amounts of money involved in the cited cases. In *Stowers v Wolodzko,* 386 Mich 119; 191 NW2d 355 (1971), a $10,000 *remittitur* was set aside. In *Stevens v Edward C Levy Co,* 376 Mich 1; 135 NW2d 414 (1965), a $4,000 *remittitur* was set aside. In *Majewski v Nowicki,* 364 Mich 698; 111 NW2d 887 (1961), a $5,700 *remittitur* was set aside. Finally, in *Soave Construction v Lind Asphalt Paving Co,* 56 Mich App 202; 223 NW2d 723 (1974), a $2,000 *remittitur* was set aside. While the principle of law remains the same, one wonders whether a casual citation to these cases is sufficient to explain the setting aside of a $1,000,000 remittitur.

Mich 1; 135 NW2d 414 (1965). This standard is obviously a very subjective one; its application here is the cause of the disagreement between the majority and myself. Review of a jury verdict becomes all the more difficult when we deal with "pain and suffering" damages; they are the epitome of intangible damages. In essence we are asked to measure the immeasurable. Nonetheless, an appellate court cannot, in all cases, defer to the judgment of the jury:

"However a court may not stand by idly when it is apparent that a verdict is shockingly excessive. A jury's verdict must have some relation to reality and it is the court's duty to keep it so." *Faulk v Aware, Inc,* 19 App Div 2d 464, 470; 244 NYS2d 259, 264–265 (1963), *aff'd,* 14 NY2d 899; 200 NE2d 778 (1964).

In determining whether this verdict is grossly excessive it is both useful and proper to examine judicial decisions of this state and other jurisdictions in order to obtain a proper perspective. See generally, *Wycko v Gnodtke,* 361 Mich 331, 341; 105 NW2d 118, 123 (1960).

My research has indicated that this jury award is the highest in the personal injury area to ever be reviewed by a Michigan appellate court. In *Williams v Department of State Highways,* 44 Mich App 51; 205 NW2d 200 (1972), *lv den,* 389 Mich 780 (1973), we approved a jury award of $1,100,000 to an injured plaintiff. That award encompassed $35,000 medical expenses, permanent loss of ability to earn any income, as well as pain and suffering. Pamela Williams was a 16-year-old girl injured in an auto accident. She suffered permanent brain-stem injuries which rendered her an aphasic. She lost control of her arm and leg movement, she was "unable to talk in any fash-

ion", and tested at the level of a 7-8 year old after the accident. Her injuries were permanent, the jury was told she would require constant medical treatment. She suffered severe emotional damage and was considered suicidal. The jury award was based on all these considerations. The *Williams, supra,* panel recognized the award to be "precedent shattering", but, under the grave circumstances of the case, approved it. To say that John Pippen's damages and injuries approach those of Pamela Williams in any way, shape or form is to denigrate the harm she suffered. Yet, his award for pain and suffering alone is equivalent to that received by Williams for medical expenses, loss of life-long income and pain and suffering.

Personal injuries involving loss of an arm are all too frequent. A review of other jurisdictions' decisions dealing with jury awards for loss of an arm reveals that the verdict in the instant case for pain and suffering is more than twice that approved by any appellate court in this country. The majority's designating this decision as merely "precedent shattering" is far too modest!

The highest award acceptable to an appellate court of another jurisdiction for pain and suffering accompanying the loss of an arm is $400,000. In *Seaboard C L R Co v McKelvey,* 270 So 2d 705 (Fla, 1972), the Florida Supreme Court approved that verdict for a 27-year-old man whose arm was amputated. McKelvey had a life expectancy of 45-1/2 years, so this award entitled him to approximately $10,000 per year for pain and suffering.[7]

---

[7] Other decisions approving large "pain and suffering" awards for plaintiffs who have suffered the loss of an arm are as follows: *Manning v Altec, Inc,* 488 F2d 127 (CA 6, 1973), [plaintiff suffered loss of both arms; awarded $525,000 which encompassed $69,000 medical expenses, $268,000 total economic loss, and $113,000 pain and suffering]; *Grant v National Acme Co,* 351 F Supp 972 (WD Mich, 1972) [plaintiff suffered loss of arm; $187,000 verdict not excessive for young

Under the majority's decision, plaintiff Pippen will receive some $80,000 per year for pain and suffering.

Other jurisdictions have been willing to set aside verdicts in arm-loss cases on the grounds of excessiveness. In *Washwell, Inc v Morejon,* 294 So 2d 30 (Fla App, 1974), the Florida Court of Appeals set aside a "pain and suffering" verdict of $383,000 awarded to a 87-year-old woman with a 5-1/2 year life expectancy. The woman's arm had been torn off in a laundromat accident. The court reset the award at $150,000.[8] In *Cooksey v Central Louisiana Electric Co,* 279 So 2d 242 (La App, 1973), an award of $408,000 for pain and suffering for a 43-year-old man was found to be excessive and reduced to $143,000.

Finally, in the case of *Wry v Dial,* 18 Ariz App 503; 503 P2d 979 (1972), cited by the majority, an award of $2,500,000 for pain and suffering was upheld by the Arizona Court of Appeals. Even a superficial reading of that case indicates that the pain and suffering endured by plaintiff Dial was excrutiating beyond belief. Plaintiff Dial was a 32-year-old electrical engineer working on a PhD in electrical engineering. He specialized in the field of microcirculation. He was maimed in an automobile accident and suffered years of devastating pain, and will continue to do so until he dies. The *Dial* court felt it necessary to expend approximately eight pages of its opinion detailing the suffering Dial underwent and still endures. The award was upheld. Joe Dial had a 39-year life expectancy. He

man], and *doCanto v Ametek,* 328 NE2d 873 (Mass, 1975) [29-year-old plaintiff suffered loss of four fingers and 95% use of arm; verdict of $467,000 encompassing loss of weekly wage of $140 not excessive].

[8] With a $383,000 verdict, Mrs. Morejon would have been entitled to approximately $70,000 per year pain and suffering, $10,000 less per year than Pippen will receive. Under the appeals court decision, she will receive approximately $28,000 per year.

received approximately $65,000 per year for pain and suffering. John Pippen will receive approximately $80,000 per year for an injury which is nowhere near the magnitude of Dial's.

In dissenting from the majority's opinion, I do not wish to downplay the pain John Pippen endures. The loss of an arm is a frightful experience. I sympathize with Mr. Pippen. I do not, however, feel that he is entitled to the enormous award bestowed upon him by the jury. The award does not comport with either legal or everyday reality.

For the above reasons,[9] I think that a new trial is mandated. GCR 1963, 527.1(3).

---

[9] Because I am convinced that the excessiveness of the verdict, taken alone, requires a new trial, I do not find it necessary to discuss any other allegations of error raised by the parties.