345 S.E.2d 791

**Kenneth L. ROBERTS**

v.

**STEVENS CLINIC HOSPITAL, INC.
and Vernon J. Magnus, M.D.**

**Nos. 16598, 16599.**

Supreme Court of Appeals of
West Virginia.

April 2, 1986.
Dissenting Opinions June 12, 1986.

G. David Brumfield, Ballard & Brumfield, Welch, for appellee.

Lawrence E. Morhous, David M. Kersey, Hudgins, Coulling, Brewster, Morhous & Cameron, Bluefield, George Sharp, Kay,

Casto & Chaney, Charleston, for Stevens Clinic.

David L. Shuman, Stephen D. Annand, Shuman, Annand & Poe, Edward T. Eardley, Steptoe & Johnson, Charleston, Rudolph J. Murensky, Lacaria & Murensky, Welch, for Vernon J. Magnus, M.D.

NEELY, Justice:

In this appeal we decide whether we should sustain a McDowell County Circuit Court $10,000,000 jury award in favor of the parents and two siblings of Michael Joseph Roberts, a 2½-year-old child who died as the result of medical malpractice. We find no reversible error in the conduct of the trial, but we find it appropriate to enter a remittitur of $7,000,000.

Kenneth and Joyce Roberts are a young couple who were married in 1976. Joyce had two children, Pepper and Ritchie, before she and Kenneth were married. And even though Ken adopted Pepper and Ritchie after the marriage, Ken and Joyce wanted to have a child of their own. After three years, Joyce gave birth to Michael Joseph Roberts on 22 December 1979. Because of a hysterectomy after Michael's birth, Joyce is no longer able to have children.

The evidence at trial indicated that Michael was the darling of the whole family. He was both an intelligent and happy little boy who was particularly close to his mother. The jury had before it substantial evidence that since Michael's death Joyce has been overwhelmed by grief and that the Roberts' family is no longer a happy household. Dr. Kenneth J. Manges, clinical psychologist, testified that each member of the Roberts' family suffered psychological injury because of the death of Michael. Ritchie is now withdrawn, and no longer sleeps in the bedroom he and Michael formerly shared. The impact, however, has been greatest on Joyce. Dr. Manges testified that Joyce had difficulty sleeping, eating, concentrating, organizing herself and her thoughts, and that she had become overly protective of her other children. At the time of trial Joyce had spent many nights crying and writing poems to Mi-

chael, and there was evidence that she continues to suffer from chronic diarrhea and vomiting. Furthermore, Dr. Manges testified that the manner in which the child died, and the parents' involvement with the child at the hospital immediately before his death increased their suffering, guilt, and anger.

The events leading to Michael's death began on the evening of 12 June 1982 when Michael had an episode of rectal bleeding following a bowel movement. Joyce was concerned, but was unable to reach Michael's pediatrician, Allen B. Carr, M.D. Joyce called Vernon J. Magnus, M.D., who attended the same church as the Roberts. Dr. Magnus checked Michael, and although the bleeding stopped after his bowel movement, Dr. Magnus recommended that Michael return for a barium x-ray. The x-ray was normal, but Dr. Magnus suggested that he do a sigmoidoscopy—a procedure by which a doctor examines a patient's rectum and lower colon.

On 21 June 1982, Dr. Magnus attempted a sigmoidoscopy in his office at the Stevens Clinic Hospital, but it hurt Michael and he stopped. Dr. Magnus then recommended a sigmoidoscopy under general anesthesia. He believed Michael might have a polyp or a small hemorrhoid in the lower part of his rectum that had caused the bleeding. Dr. Magnus told the Roberts that if Michael had a polyp, it could be snipped off in a simple procedure that might not even require a stitch.

The Roberts family then went on a two-week vacation during which there were two occasions when mild bleeding recurred.

On 13 July Dr. Magnus performed a sigmoidoscopy on Michael. In addition to the sigmoidoscopy, however, Dr. Magnus performed a biopsy without the parents' permission, and in doing so perforated Michael's colon. Fecal material spewed into the child's abdominal cavity and, as a result, Michael developed peritonitis, a severe infection. The sigmoidoscopy and biopsy were performed at approximately 8:30 a.m. and Michael was returned to his room at approximately 9:50 a.m. following the procedure. At that time Mrs. Roberts noticed that Michael's stomach was swollen. She asked nurse Sandy Alderman and Dr. Magnus who came into the room what was wrong with Michael. Dr. Magnus said it was just gas. The jury was entitled to infer that at that point Dr. Magnus had still not informed the Roberts that he had performed an unauthorized biopsy.

Dr. Magnus left immediately after talking with Joyce and Ken. Later in the morning, however, Joyce noticed Michael's throat quivering. She called for a nurse; the nurse checked Michael and determined that he had labored breathing. The nurse informed Joyce that Dr. Magnus had been called, and later the hospital staff inserted a rectal tube in Michael and Joyce was asked to watch to see if Michael expelled gas through the tube. Michael's breathing was still labored, his stomach was swollen, and he began vomiting and complaining of pain in his stomach.

At 2:45 p.m. the nurses pumped Michael's stomach. After visiting Michael at 3 p.m., Nurse Alderman told Joyce and Ken that she did not believe that Michael was getting any better, and advised them to insist that something be done. Up until that time, whenever Ken or Joyce asked what Michael's problem was, they were told that he had gas and was going to be fine. At this point, however, Ken went to the desk and demanded that greater attention be given to Michael. About an hour later, at 4 p.m., Dr. Magnus finally arrived, followed shortly thereafter by Dr. Johnston, another hospital staff surgeon. Then Michael's pediatrician, Dr. Carr, checked Michael. Dr. Carr said that he feared that Michael had a perforated bowel. Michael was later x-rayed, and after his return from x-ray, Dr. Magnus returned to Michael's room and told Joyce he had perforated Michael's colon when he did the biopsy that morning.

Dr. Magnus returned Michael to surgery, placed him under a general anesthetic, and attempted to repair the ruptured bowel. Michael never awakened from the anesthetic.

From the time Michael returned from the biopsy in the morning until he reentered

the operating room that evening, he received no antibiotics to treat his infection. After the biopsy, the hospital staff had attempted to administer some antibiotics and fluids thorugh an I.V., but because the I.V. needle infused into Michael's tissue rather than his vein, Nurse Alderman removed the I.V. During the day, there were no other attempts to administer either fluids or an antibiotic. Michael finally received fluids through an I.V. in the operating room at 5:35 p.m., and he received his first antibiotic for his severe infection at 5:43 p.m. The operation to repair the hole in Michael's colon was begun at 5:50 p.m., seven minutes after the antibiotic was administered.

On 3 November 1982 Kenneth L. Roberts, as administrator of Michael's estate, sued the Stevens Clinic Hospital and Dr. Magnus for Michael's wrongful death. The complaint alleged simple negligence and enumerated $4,281.55 in medical expenses and $2,591.00 in funeral and burial expenses. The complaint did not ask for punitive damages, but did ask for $20,000,000 in compensatory damages. After two-weeks of trial and two hours of jury deliberations, the jury returned a verdict in favor of the plaintiff in the amount of $10,000,000 compensatory damages. Both Dr. Magnus and the Stevens Clinic Hospital appealed to this Court.

I

Most of the errors that the defendants assert on appeal were waived at trial because no timely objection was made. From our review of the briefs and the four volumes of proceedings below, we conclude that both sides in this case believed that they were going to win before the jury. Apparently the defendants believed that a local, McDowell County jury would be reluctant to award large damages for the death of an infant against the community's only full service hospital and one of its local practicing physicians. Consequently, it was obviously the defendants' trial strategy to minimize the number of technical objections.

History, of course, has vindicated the plaintiff's estimation of the value of the case, but the defendants believed that they would have a sympathetic jury on the issue of damages, if not liability. Their trial strategy of not asserting frivolous objections was reasonable, and although defense counsel's failure to object makes it easy for us to write this opinion without its assuming the dimensions of Averroes' *Commentaries on Aristotle*, we can say from a review of the record that the result in this case would not be otherwise had objections been made with the regularity of a pendulum. On appeal, Dr. Magnus does not assert that the jury's finding of liability is unsupported by the evidence. Both the doctor's negligent treatment and his failure to warn the Roberts of the possible dangers of a biopsy were firmly established.

II

At trial the plaintiff introduced into evidence a professionally prepared, twenty minute, videotape that combined "home movie" video recordings of Michael taken by a neighbor with a series of still, colored, photographs of Michael and the family. The audio background for this video presentation consisted of tape recordings of the child's voice as well as Joyces' voice singing and talking to the child. It is the defendant's contention that this film was a "theatrical" presentation that artistically highlighted certain aspects of Michael's life and Joyce's relationship to Michael in an inaccurate way.

We have reviewed the tape in its entirety and we find nothing inflammatory or prejudicial about it. *W. Va. Code*, 55–7–6 [1982], our wrongful death statute, provides in section (c)(1):

"The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; ..."

The purpose of the videotape was to demonstrate that Michael was a healthy, intelligent, enthusiastic, and well loved child. So

as a preliminary matter, the videotape was relevant. *W.Va.R.Evid.* 401, 402.[1] In our review of the tape, we find no artistic highlighting that emphasizes some scenes or photographs more than others, and we find no merit in the defendant's assertion that because the mother's voice went on several seconds after the screen turned black, an unduly sentimental atmosphere was evoked that would have prejudiced the jury.

■ This Court has not previously addressed the admissibility of videotape "Day-in-the-Life" films. The same evidentiary rules that govern the admissibility of recordings and photographs govern the admissibility of videotape evidence. *W.Va. R.Evid.* 1001(2).[2] The general rule is that pictures or photographs that are relevant to any issue in a case are admissible. Furthermore, the trial judge is afforded wide discretion in determining the admissibility of videotapes and motion pictures. *Szeliga v. General Motors Corp.*, 728 F.2d 566, 567 (1st Cir.1984); *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603, 618 (1983).

■ We are not unmindful of the potential dangers inherent in such presentations. As one court has explained:

Almost always an edited tape necessarily raises issues as to every sequence portrayed of whether the event shown is fairly representative of fact, after the editing process, and whether it is unduly prejudicial because of the manner of presentation.

*Bolstridge v. Central Maine Power Co.*, 621 F.Supp. 1202 (D.C.Me.1985) (Plaintiff's

"Day-in-the-Life" videotape excluded when open court testimony could demonstrate similar evidence, and admission of videotape would create risk of distracting jury and unfairly prejudicing defendant). A videotape's tone and editing, as well as the availability of similar evidence through in-court testimony, are all factors a trial court should consider in deciding whether to admit a videotape. But, we shall not reverse a trial court's decision in these matters unless the record shows a clear abuse of discretion. *See Gough v. Lopez*, 172 W.Va. 288, 304 S.E.2d 875 (1983) (Evaluation of remoteness of evidence left to trial court's discretion).

### III

#### A

■ The defendants assert that four of the plaintiff's instructions were erroneous and that the court erred in failing to give one instruction of Defendant Magnus and two instruction of Defendant Stevens Clinic. This Court will presume that a trial court acted correctly in giving or refusing instructions, unless the instructions given were prejudicial or the instructions refused were correct and should have been given. Syl. Pt. 1, *State v. Turner*, 137 W.Va. 122, 70 S.E.2d 249 (1952). In making this determination, the Court will review the instructions as a whole. *McAlister v. Weirton v. Hosp. Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983), *quoting*, Syl. Pt. 3, *Lambert v. Great Atlantic & Pacific Tea Company*, 155 W.Va. 397, 184 S.E.2d 118 (1971).

■ We have reviewed the plaintiff's instructions and find that they might have been worded more precisely, but that they accurately stated the law.[3] The defen-

---

**1.** This Court adopted the *West Virginia Rules of Evidence* on 1 February 1985. Accordingly, the rules were not effect at the time of the proceedings below. But our position on this point is the same under the rules or the common law. Because the rules will govern all future cases, we have stated our holding in the phraseology of the rules rather than the common law.

**2.** *W.Va.R.Evid.* 1001(2) reads:
*Rule 1001.* Definitions. For purposes of this article the following definitions are applicable:

(2) *Photographs.*—"Photographs include still photographs, x-ray films, videotapes, and motion pictures."

**3.** The instructions in question are: Plaintiff's Instruction Nos. 5, 6, 8, and 17; Defendant Magnus' Instruction No. 4; and, Defendant Stevens Clinic's Instruction Nos. 12 and 15. To discuss them individually in the opinion would serve little purpose because they are clearly not prejudicial.

dant's jury instructions that were refused simply advised the jury that they should decide the case in accordance with the evidence and the instructions and that bias, sentiment or feelings of sympathy had no proper, legal weight. These instructions stated the obvious and were simply repetitive of other instructions given by the court. As we have stated:

"It is not error to refuse to give an instruction to the jury, though it states a correct and applicable principle of law, if the principle stated in the instruction refused is adequately covered by another instruction or other instructions given."

Syl. Pt. 3, *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897 (1966).

### B

■ The defendants next assert that it was error to allow jurors serving for circuit court "B" to be impaneled for this case because Mildred Ellen Altizer, the grandmother of the plaintiff's decedent, was serving on the panel. However, at the time of voir dire both sides knew of Mrs. Altizer's service on the circuit court "B" panel (or with reasonable diligence should have known) and no objection was made. Furthermore, the circuit court allowed extensive, individual voir dire and no member of the jury indicated any friendship with members of the plaintiff's family.

### C

■ Defendants assert that it was an error to allow the plaintiff to inquire of a hospital employee about previous complaints by the nursing staff against Dr. Magnus. Again, however, no objection to this line of questioning was made by defendant Magnus at trial, and when an objection was raised by the hospital, the trial judge sustained the objection at the time; no request either for a mistrial or for a

curative instruction was made by either defendant. Furthermore, because one of the grounds for the hospital's liability was its possible negligence in allowing Dr. Magnus to practice there, that line of questioning was proper. Whether the hospital allowed a known incompetent to continue to enjoy hospital privileges was a major point to be decided in determining the hospital's negligence.

### D

■ The defendants assert that it was error for the trial court to refuse to recall the jury or otherwise determine the validity of a rumored, initial vote by the jury panel to award $250,000,000 to the plaintiff. We find no error. The internal operations of a jury panel are presumed to be fair. Voir dire allows litigants to discover juror prejudice before a trial. We will not allow a post-trial, collateral attack upon a jury's integrity in the absence of a showing of corruption or bias. Because the ultimate jury award was for $10,000,000 and not $250,000,000, the fact that the higher number was discussed or even voted upon is entirely irrelevant.[4] Defendant Magnus' contention that the jury should be recalled is nothing more than a restatement of his contention that the jury's award is excessive. We shall discuss this contention in an extensive and straightforward manner below.

### IV

■ The jury's verdict found the defendant doctor 82 percent negligent and the defendant hospital 18 percent negligent. The hospital asserts that the trial court erred in failing to direct a verdict in its favor and, indeed, there is substantial evidence in the record before us that the nursing staff of the hospital did everything in their power to overcome the defective

4. What the jury's discussion of a possible $250 million judgment probably implies is "innumeracy," a phenomenon with regard to numbers akin to illiteracy. Innumeracy, however, does not demonstrate "bias" or "prejudice" anymore than illiteracy. Whether, however, jurors have some understanding of what numbers like 10 million or 250 million mean is a fit subject for

exploration on voir dire, in the same way that determining literacy is fit subject for exploration on voir dire. For an extensive discussion of "innumeracy" *See* Douglas R. Hofstadter, "Metamagical Themas: Number Numbness, or Why Innumeracy May Be Just as Dangerous as Illiteracy," *Scientific American,* pp. 20–34 (May, 1982).

treatment that Michael had received from Dr. Magnus. Nonetheless, there is expert testimony in the record that the hospital did not have the type of pediatric care facilities required by West Virginia State Department of Health regulations and that Michael was not monitored in a way appropriate for a child in his condition.

There was also evidence that the hospital did not comply with State Department of Health regulations concerning supervision of its medical and nursing staffs, and that the hospital did not provide annual evaluations of its staff doctor, Dr. Magnus. Dr. Magnus, himself, testified that the hospital's nurses were regularly used by staff doctors to obtain consents for surgery from hospital patients, although the joint commission on accreditation of hospitals (of which defendant hospital is a member) has regulations that require hospitals to have doctors obtain appropriate consents. It is alleged that this practice contributed to Dr. Magnus' doing a procedure he had absolutely no permission to do—the biopsy.

■ The plaintiff also introduced evidence that the hospital was negligent in granting Dr. Magnus full surgical privileges in light of the fact that before coming to Stevens Clinic Hospital he had been primarily a family practitioner and had never previously been granted full surgical privileges. A motion for a directed verdict may properly be granted only when it appears from all the evidence presented that the party against whom the verdict is sought would not be entitled to a verdict under any view of the evidence. Syl. Pt. 2, *Cox v. Galigher Motor Sales Co.*, 158 W.Va. 685, 213 S.E.2d 475 (1975); *Hinkle v. Martin*, 163 W.Va. 482, 486, 256 S.E.2d 768, 770 (1979). Thus, we conclude that the defendant hospital's negligence *vel non* was properly a jury question and that the court did not err by failing to direct a verdict for the defendant hospital.

## V

■ We now come to the most serious problem in this case, namely the closing argument of plaintiff's counsel. In a nutshell, the reason that we are compelled to reduce the jury's award from $10,000,000 to $3,000,000 is that plaintiff's counsel implied, in his closing argument, that the duty of the jury was to place a value on Michael's life. No objection along those lines, however, was made during the closing argument, and for that reason we are undisposed to reverse the entire trial because, technically, the error was waived.[5] Yet we find that counsel's closing argument was not entirely consistent with either *W.Va. Code*, 55–7–6 [1982], our wrongful death statute, or the court's instructions.

Plaintiff's counsel made a number of analogies during closing argument that could lead a juror only to believe that the juror's job was to evaluate Michael's life in terms of money. Counsel argued that if a $10,000,000 racehorse had been killed through the negligence of a veterinary hospital, the measure of damages would be exactly $10,000,000. At another point in the argument counsel asked what would have happened if someone had approached Michael's parents with an envelope containing ten, $1,000,000 winning lottery tickets and asked the parents if they would trade Michael's life for the tickets. Finally, counsel made reference to the American space program where billions of dollars are spent to avoid the loss of a single life. Representative excerpts from counsel's closing argument are as follows:

> "When I was growing up, the kids used to say 'Boy, that's valuable. That must be worth a million bucks.' Well, as you know, in light of inflation, that same item might be worth ten million dollars today. Really, a million dollars isn't all that much anymore ...
>
> If the race horse is worth $10,000,000, that's what the Roberts would be entitled to. It wouldn't be fair for us to come in

---

5. We point out that there was no objection to the argument, but can anyone seriously contend that a timely objection and a "curative" instruction would have changed the outcome in this case? In the roughly seven seconds available to counsel to make the strategic decision whether to object, it probably dawned on counsel that an objection and "curative" instruction would serve only to reinforce plaintiff's counsel's point.

and ask for $11,000,000 and it wouldn't be right, for the defense to say, 'We only want to pay $9,000,000' and that case would be easy. Justice would require a verdict of $10,000,000 ...

Now if Michael were a race horse and the Stevens Clinic Hospital operated a veterinarian hospital and a race horse named Michael died as a result of the negligence of a veterinary doctor, you wouldn't have any trouble in returning a verdict for millions of dollars because you know that that's what race horses are worth. You tell me, you tell the family, are horses entitled to better care than children? And are children less valuable than horses? ...

Another guide tells you what, in modern day life, how high the value is placed on society is in the military. Millions and billions of dollars are spent on preventive measures. Why? To protect the life of the soldiers. If a military plane costing millions of dollars gets in trouble, what's the call? Get the pilot out. Let the plane crash....

And what about our space program? I'm proud of our country. 225,000,000 people, but when we made the decision to go into space, a decision was made that not one single life would be sacrificed as a guinea pig. The decision was made that we would bring our astronauts back. And billions have been spent for all the safety devices to insure that they come back."

Our wrongful death statute, *W. Va. Code*, 55–7–6 [1982][6] (the statute in effect at the time of Michael's death) specifically sets forth in subsections (c)(1) and (2) the losses for which damages can be recovered. Obviously, if the measure of damages were the value of a human life then, arguably, no jury verdict could be excessive. The death of a family member, particularly a child, involves inconsolable grief for which no amount of money can compensate. Counsel's suggestion that the Roberts would not have traded Michael's life for $10,000,000 is entirely accurate—but they would also not have traded Michael's life for $100,000,000 or even a $1,000,000,000.[7]

## VI

■ In West Virginia, an appellate court will not set aside a jury verdict upon the claims that it is excessive, "unless the verdict is monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption." Syl. Pt., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). Obviously, applying that standard entails a largely subjective exercise on the part of appellate judges.

■ The proceedings below took two full weeks of trial, prodigious amounts of lawyer and witness time, and substantial litigant and state expense. In West Virginia the remedy of remittitur is unusual when the damages in a case do not admit to an exact calculation, but in other jurisdictions we find ample authority for the procedure we now invoke. *Al McCullough Transfer Co. v. Pizzulo*, 7 Ohio Op. 319, 53

---

6. *Code,* 55–7–6 [1982] provides:

The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses.

(2) In its verdict the jury shall set forth separately the amount of damages, if any, awarded by it for reasonable funeral, hospital, medical and said other expenses incurred as a result of the wrongful act, neglect or default of the defendant or defendants which resulted in death, and any such amount recovered for such expenses shall be so expended by the personal representative.

7. Yet in conceding that there are policy reasons for imposing some ceiling on wrongful death recoveries we wish to imply no sentiment to return to the days before Lord Campbell's Act, when under the common law the death of a person could not be a wrong, nor to any other parsimonious theory that allows but nominal recovery to family survivors for the non-economic losses associated with the death of a loved one.

Ohio App. 470, 5 N.E.2d 796, 800 (1936) (Appeal court entered remittitur of $5,000 after excessive verdict of $10,000 in part created by plaintiff's counsel's closing argument inviting jurors to "trade places" with injured plaintiff); *Yerrick v. East Ohio Gas Co.*, 27 Ohio Op.2d 67, 119 Ohio App. 220, 198 N.E.2d 472 (1964). (Plaintiff's closing argument held improper, and even though no objection to argument was made at time the argument was delivered, and no request was made that jury be told to disregard argument, judgment of $115,-000 was held excessive. Remittitur of $25,-000 ordered).

In the past, this Court has held the minority rule [8] that when there are no data by which the amount of the excess is definitely ascertainable, a remittitur is impermissible. Our rule has been that no part of an erroneous verdict can be saved by a remittitur and that the whole verdict must be set aside. *Earl T. Browder, Inc. v. Webster County Court*, 145 W.Va. 696, 116 S.E.2d 867 (1960). The present case demonstrates the unreasonable nature of this rule. The verdict of the jury and judgment of the trial court are plainly right on the issue of liability. But the amount of the verdict is excessive even though the Roberts' damages are substantial. The majority rule about remittitur allows us to give the Roberts their choice of a set amount of damages or, if they believe our estimation of their case to be too niggardly, a new trial. *See Smithey v. Sinclair Refining Co.*, 203 Va. 142, 122 S.E.2d 872 (1961).

Thus, we have decided to dispose of the one meritorious assignment of error, namely the excessiveness of the verdict, simply by asking ourselves: "What is the highest jury award under the facts of this case that would not be monstrous and enormous, at first blush beyond all measure, unreasonable and outrageous, and such as manifestly shows jury passion, partiality, prejudice, or corruption?" Our answer, after substantial collegial discussion, is $3,000,000 and that is the amount that we will allow to stand. We believe that our conclusion in this regard is grounded in sound public policy, which we now proceed to discuss.[9]

## VII

In deciding this case, we recognize that over 94 percent of all civil actions in which pleadings have been filed are settled voluntarily by the parties, and some incalculable number more potential cases are voluntarily settled after lawyers have been contacted but before any formal court action has been taken.[10] Consequently, because less than 6 percent of all serious lawsuits are tried, the most important thing that courts do is to cast a shadow of legal rules within which litigants can craft their own custom-made settlements. The defendants in the case before us are here complaining about the excessiveness of the jury's verdict; however, they do not discuss the enormous investment of plaintiff's counsel in the development of expert testimony, the cost of preparing exhibits, or the cost of legal research in order to go to trial.

When defendants wish to fight plaintiffs tooth and nail, both the complexity of preparing for trial and the glacial pace of the judicial process guarantee at least a four year delay between the filing of a legit-

**8.** *Discussed in: Earl T. Browder, Inc. v. Webster County Court*, 145 W.Va. 696, 700, 116 S.E.2d 867, 872 (1960); *Fortner v. Napier*, 153 W.Va. 143, 151, 168 S.E.2d 737, 742 (1969). *See also* 58 Am.Jur.2d, New Trial § 226, n. 19.

**9.** While the plaintiffs furnished us with a number of cases where jury verdicts of this magnitude have been approved, the plaintiffs in those cases had suffered severe personal injuries that necessitated enormous future medical care costs and also loss of earning capacity. These elements are absent in this case. *See, e.g., Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99 (Mo.1985) (en banc); *Reilly v. South-*

*eastern Pa. Transportation Authority*, 507 Pa. 204, 489 A.2d 1291 (1985); *Hasson v. Ford Motor Company*, 32 Cal.3d 388, 185 Cal.Rptr. 654, 650 P.2d 1171 (1982), *cert. dismissed*, 459 U.S. 1190, 103 S.Ct. 1167, 75 L.Ed.2d 422 (1983); *Niles v. City of San Rafael*, 42 Cal.App.2d 230, 116 Cal. Rptr. 733 (1st Dist.1974).

**10.** *See* Council on the Role of Courts, *The Role of Courts in American Society*, West Publishing Co., 1984, pp. 28–34. Galanter, *Reading the Landscape of Disputes: What We Know and Don't Know (And Think We Know) About Our Allegedly Contentious and Litigious Society*, 31 UCLA L.Rev. 4 (1983).

imate complaint and the chancey receipt of the first dollar in damages. In the present case, the plaintiff has shown the defendant's liability in a clear-cut manner. To send the plaintiff back to square one, because the verdict is excessive would be more than unfair; it would also be a waste of litigant resources and send the wrong signal to other prospective litigants.

In this latter regard our decision is instructed by the fact that both the design of a law firm and the corresponding corporate structure of a client may create counterproductive approaches to litigation. Specifically, insurance company officials are fiduciaries who feel most comfortable when they pay their lawyers by the hour. Big defense law firms respond to their clients' accounting requirements by adopting case management systems that allow them to "build a file" that creates a paper trial to justify their bills. In the case before us, the fact that the only offer of settlement on the defendant's side came on the eve of trial, after the plaintiff had sustained enormous expenses in preparing the case, is circumstantial evidence of the accuracy of this observation.

Without months or years of depositions, interrogatories, and pretrial motions, defense law firms cannot build a file to justify fees, and large fees are necessary to sustain the overhead of large firms. Insurance clients and other defendants, then, can find themselves engaged in potentially disastrous, all-or-nothing litigation simply because their lawyers are in the litigation business and not the cheap settlement business. Without the occasional jury award that is at least ten times greater than what the parties would have settled for immediately after the tragedy,[11] there would be no incentive on the part of clients to temper the file building, anti-settlement proclivities of their lawyers by urging quick payment of just claims. Sometimes, of course, it is the clients who insist on litigation against

the advice of their lawyers, and this too is more likely to be avoided when appellate courts restrain themselves in the supervision of jury awards.

Ideally, in a case such as the one before us where the negligence of the defendants is palpable, some just compensation for Michael's death would have been forthcoming within thirty days. Yet Michael died in July, 1982 and it is now April, 1986 without the Roberts' having received any compensation whatsoever for Michael's loss.

When the defendants moved for leave to file an appeal in this Court, the Court asked the parties to describe the settlement negotiations that preceded the trial. Such information is generally inadmissible and incompetent to show liability or set the measure of damages. *Shaeffer v. Burton,* 151 W.Va. 761, 155 S.E.2d 884 (1967); *McMillen v. Dettore,* 161 W.Va. 346, 242 S.E.2d 459 (1978). But we believe that settlement discussions have some bearing on the necessarily subjective criteria that appellate courts use to determine a proper remittitur, because such a determination affects future settlement negotiations.

We used this case's settlement history not as an indicia of liability or lack thereof, but as a barometer of each party's conduct in trying to settle the case. Obviously, there are some cases that need to go to a full trial,[12] but most cases, including the one before us, that do not present questions of broad societal interest that require public hearings are simple questions of "how much" and little more. Settlement has become too large a part of our civil liability system to remain entirely in the unilluminated background. Our exception to the venerable and hoary evidentiary rule excluding all mention of settlement at any stage of in-court proceeding is necessary if a jurisprudence of settlement is to be cre-

---

11. Counsel for defendant Magnus conceded in oral argument in this court that $300,000 would have been the outer limit of an appropriate jury award. Certainly it would have been an appropriate settlement figure if offered within 60 days of Michael's tragic death. .

12. *See* Owen Fiss, *Against Settlement,* 93 Yale L.J. 1073 (1984). An example of such would be *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

ated.[13] Accordingly, we asked the litigants to brief the subject, and the appellee included a section in his brief outlining the offers and counteroffers made.

About two months before trial plaintiff's counsel made a written offer to both defendants to settle for $5,000,000, which was approximately half of the total available insurance coverage of $10,250,000. No response was received from the defendants until the Friday afternoon before the Monday morning trial date! At that time defendant Magnus offered $100,000 and the offer was rejected. The next day the offer was increased to $125,000, and after one week of trial, when most of the plaintiff's evidence was in, and both defendants had reason to expect a substantial verdict, defendant Magnus increased the offer to $220,000.

### VIII

In light of the statistically demonstrable fact [14] that settlement rather than litigation is the true cynosure of the whole judicial process, in this case, then, we not only ask ourselves how much money the Roberts family should receive to compensate them for the losses enumerated under the Wrongful Death Statute; we also ask ourselves what jury award in a case of this type will establish the proper climate for out-of-court settlements. Certainly these considerations were in the background of our court's reasoning when the extremely liberal *Addair, supra,* criteria for reviewing jury awards were formulated.

### IX

Our law emerges from an 800-year-old tradition, and thus most of the materials we have to work with are dictated by the happenstances of history rather than by any intelligently calculated design. The jury system is a given, as are both "the law's delay [and] the insolence of office." [15] But in the constraints under which our materials place us we differ little from other architects, builders, and engineers. If, for example, an architect or engineer with sensitive measuring devices were to stand in the nave of the Great Cathedral in Salisbury, England, he would discover that the tip of the cathedral's spire is exactly 3.2 feet off dead center in the direction of the southwestern prevailing winds. Someone unfamiliar with the prevailing winds and the flexibility of structures built from stone and medieval mortar might conclude that Salisbury's builders were sloppy craftsmen; yet it is the deviation from theoretical perfection, a concession to reality, that has permitted the spire to survive in all its splendor hundreds of years of punishment by the elements.

Medieval cathedrals like Salisbury do not sustain our attention and draw us back time and time again because they achieved spectacular heights or supported incredible stresses. Any modern architect can design and execute a cathedral with the proportions of New York's World Trade Center supporting a load several hundred times the weight of all parts of Salisbury combined. What is amazing in Gothic architecture is the effect, in terms of upward thrust and exhilarating proportions, achieved with primitive materials. The flying buttress is not itself beautiful; it is a beautiful concession to nature's physical laws of outward force.

**13.** The common law rule is codified in *W.Va. R.Evid.* 408 which reads:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

**14.** *Supra,* Note 9.

**15.** *Hamlet*

Greatness in architecture is not achieved by creating a good structure from superb materials; it is achieved by creating a superb structure from mediocre materials. The same general criterion of judgment applies to government. To say that our judicial system is imperfect is to engage in a triumph of understatement. A plaintiff with a just claim has both a long and hard march to recover damages. Courts understand that juries operate on largely emotive principles and that jury awards can be substantially in excess of what judges, educated in law as a science, would award in similar circumstances.

Yet close to unbridled discretion is reposed in a jury in this jurisdiction to award such damages as it feels proper *exactly* because of the *in terrorem* effect on defendants that potentially large jury awards have as a counterweight to the *in terrorem* effect on plaintiffs that outrageous expense, incalculable inconvenience, and inordinate delay have. The similarities between the legal system and Salisbury, then, become apparent: Judges understand the imperfections in the materials with which they must work and attempt to achieve some structural balance by offsetting one imperfection against another.

If, however, these are some of the considerations that guide our decision to allow $3,000,000 of the $10,000,000 judgment to stand, it is logical to ask why we do not sustain the entire verdict. The answer to that question involves modern tort law's mechanism for spreading risk throughout society through universal insurance coverage.

 The object of tort law is to provide reasonable compensation for losses in an *expeditious* fashion. Thus some penalty for unreasonable delay is appropriate. Tort law, however, is not designed to be a Las Vegas game of chance; it serves no useful purpose to turn the tort system into a lottery where everyone pays high insurance premiums so that enormous windfalls can be allocated randomly. As one judge explained:

> Courts are reluctant to undertake the speculative task of setting a figure beyond which an award is excessive. It is a responsibility which must be assumed at some time however. Otherwise, as awards get higher, the proponents of each will justify its reasonableness on the precedent of the approval of the highest previous award.

*Baird v. Chicago, Burlington and Quincy Railroad Company,* 32 Ill.App.3d 1, 334 N.E.2d 920 (1975) (Green, J., dissenting). The sky is not the limit with regard to jury awards,[16] and at some point premium payers—who are somewhat like taxpayers—must be protected from paying excessive premiums.

 Accordingly, for the reasons set forth above the judgment of the Circuit Court of McDowell County is reversed and the case is remanded to the circuit court with directions to enter a remittitur of $7,000,000 and enter judgment on the verdict for $3,000,000 or, in the alternative, at the option of the plaintiff, to award a new trial.

Reversed and remanded with directions.

McHUGH, Justice, dissenting:

I respectfully but resolutely dissent. I do not agree with the majority's decision to direct the entry of a remittitur (or in lieu thereof, if the plaintiff elects, a new trial [1]).

---

**16.** *Caldarera v. Eastern Airlines, Inc.,* 705 F.2d 778, 784 (5th Cir.1983).

**1.** The new trial option extended by the majority is apparently not restricted to the issue of damages. This conclusion is curious because the majority concludes that there was no reversible error in the conduct of the trial and that the finding of liability is "plainly right." Indeed, as noted by the majority, Dr. Magnus does not contest on this appeal the finding of liability. (At trial Dr. Magnus did not call any expert witnesses on his behalf.) The hospital, on the other hand, does contest its liability. My review of the record indicates that the evidence supporting the hospital's liability was so weak that I, as a member of the jury, would have contended for a percentage much less than the 18 percent of the total fault found by the jury to be the hospital's comparative negligence. Even counsel for the plaintiff conceded during closing argument that there was no evidence that the nurses were negligent. The majority is correct, though, in its holding that there was sufficient

Syllabus point 6 of the majority opinion overrules, without so stating, a long line of cases which, I believe, are well-reasoned.[2] The majority opinion is also repugnant to a provision of the *Constitution of West Virginia,* specifically, *W.Va. Const.* art. III, § 13.[3] The Great Cathedral in Salisbury, England, exalted in the majority opinion, is not as far "off dead center" as the legal architecture of the majority opinion on the issue of the propriety of a remittitur in a case involving indeterminate damages.[4]

In light of my opinion that a remittitur is improper in a case involving indeterminate damages, I also wish to disclaim any opinion on the validity of syllabus point 7 of the majority opinion concerning the Court's use of pretrial settlement negotiation amounts to determine the amount of a remittitur which will encourage out-of-court settlements.

### I. OVERRULED PRECEDENTS

### A. WRONGFUL DEATH DAMAGES: A JURY QUESTION

A fundamental principle must be kept in mind: "[a]ssessment of damages [where the law gives no specific or fixed measure] is the jury's job." *Mooney v. Eastern As-*

*sociated Coal Corp.,* 174 W.Va. 350, 353, 326 S.E.2d 427, 430 (1984). While this principle applies to damages for pain and suffering in personal injury cases, it is especially applicable to damages for solatium in wrongful death cases. *See Hawkins v. Nuttallburg Coal & Coke Co.,* 66 W.Va. 415, 416, 66 S.E. 520, 520 (1909).[5] Prior to the majority opinion herein, this Court has been definite and consistent in its holdings limiting judicial review of the size of jury verdicts in wrongful death cases. Heretofore, it was well settled in this jurisdiction that where the jury finds the defendant liable in a wrongful death action, it has virtually absolute discretion, under the express terms of the wrongful death statute, without regard to proof of actual damages, pecuniary loss and the like, to make any award it deems "fair and just," subject only to the passion-and-prejudice rule discussed *infra.* *Kesner v. Trenton,* 158 W.Va. 997, 1002, 1007, 216 S.E.2d 880, 884, 886 (1975); *Legg v. Jones,* 126 W.Va. 757, 762, 30 S.E.2d 76, 79 (1944); *Keesee v. Atlantic Greyhound Corp.,* 120 W.Va. 201, 204, 197 S.E. 522, 523 (1938); syl. pt. 4, *Black v. Peerless Elite Laundry Co.,* 113 W.Va. 828, 169 S.E. 447 (1933); *Hawkins v. Nuttalburg Coal & Coke Co.,* 66 W.Va.

---

evidence of the hospital's negligence (relating to its initial investigation and annual evaluation of Dr. Magnus) to withstand the hospital's motion for a directed verdict. In any event, for the sake of internal consistency, the majority opinion should extend the option of a new trial limited to the issue of damages.

2. In the body of the majority opinion, two of the precedents of this Court contrary to the majority's holding on remittitur are cited but are not expressly overruled: *Fortner v. Napier,* 153 W.Va. 143, 168 S.E.2d 737 (1969); *Earl T. Browder, Inc. v. County Court,* 145 W.Va. 696, 116 S.E.2d 867 (1960). This covert manner of overruling cases is not new to the author of the majority opinion. *See Board of Church Extension v. Eads,* 159 W.Va. 943, 956 n. 6, 230 S.E.2d 911, 918 n. 6 (1976) (expressly overruling a precedent deep within a lengthy footnote, a fact not overlooked in the concurring and dissenting opinions therein).

3. *W.Va. Const.* art. III, § 13, part of this State's Bill of Rights, provides:

In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury,

if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. *No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.* (emphasis added)

4. The majority opinion is encumbered with unnecessary dicta. I will resist the temptation to dissent to the dicta, such as whether there are similarities between the legal system and the Great Cathedral in Salisbury, because "a dissent to dicta is like the sound of one hand clapping[.]" *Pittsburgh Elevator Co. v. West Virginia Board of Regents,* 172 W.Va. 743, 757–759, 310 S.E.2d 675, 690 (1983) (Neely, J., concurring in part and dissenting in part). "[L]aw must be written with care. It is meant to be an exercise of the mind, not a venting of the spleen." *Id.*

5. I use the term "solatium" in this opinion to categorize those emotional injuries listed in *W.Va.Code,* 55–7–6(c)(1)(A) [1982], quoted *infra* in the text after the discussion of *Bond v. City of Huntington,* 166 W.Va. 581, 276 S.E.2d 539 (1981), in which this Court used the term "solatium" in the identical manner. *See also Black's Law Dictionary* 1248 (5th ed. 1979).

415, 416–17, 66 S.E. 520, 520–21 (1909); *Kelley v. Ohio River R.R.*, 58 W.Va. 216, 223, 52 S.E. 520, 523 (1905); *Sample v. Consolidated Light & Ry.*, 50 W.Va. 472, 473–74, 40 S.E. 597, 598 (1901); *Couch v. Chesapeake & O. Ry.*, 45 W.Va. 51, 55–56, 30 S.E. 147, 149 (1898); syl. pt. 5, *Turner v. Norfolk & W.R.R.*, 40 W.Va. 675, 22 S.E. 83 (1895); *Dimmey v. Wheeling & E.G.R.R.*, 27 W.Va. 32, 56–57 (1885). Indeed, the amount of the verdict of the jury in a wrongful death case will ordinarily not be disturbed as long as there is a rational basis for such verdict taking into consideration all of the evidence. *Salerno v. Manchin*, 158 W.Va. 220, 227, 213 S.E.2d 805, 809 (1974). While the majority opinion herein does not, intentionally, overrule this line of cases, I fear the effect of the majority opinion, at least long term, will be to overrule this line of cases and to encourage judicial interference with wrongful death (and personal injury) verdicts as being "excessive."

In *Bond v. City of Huntington*, 166 W.Va. 581, 276 S.E.2d 539 (1981), this Court traced the legislative history of the wrongful death statute, *W.Va.Code*, 55–7–5, –6 and –7, and noted that the Legislature in the year 1976 removed the statutory "ceiling" on recovery, so that there are no maximum limits, under the statute, on the amount of recovery. 276 S.E.2d at 541. *W.Va.Code*, 55–7–6(b)[1982] [6] provides that the jury "may award such damages as to it may seem fair and just[.]" *W.Va.Code*, 55–7–6–(c)(1)(A)[1982] contains a noninclusive list of the types of emotional injuries for which the jury must determine—necessarily, subjectively—an amount of money as "compensation": "The verdict of the jury shall include, but may not be limited to, damages for the following: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent[.]" Thus, for these indeterminate, nonpecuniary damages, " '[t]he law furnishes no measure of damages other than the enlightened conscience of impar-

tial jurors guided by all the facts and circumstances of the particular case.' " *Couch v. Chesapeake & O. Ry.*, 45 W.Va. 51, 55, 30 S.E. 147, 149 (1898) (citation omitted). *See also Kesner v. Trenton*, 158 W.Va. 997, 1007, 216 S.E.2d 880, 886 (1975).

One of the factors enlightening the jurors' conscience in a wrongful death case, as in a personal injury case, is the deterrent aspect of compensatory damages. "A jury award for pain and suffering [or for solatium] is an inherently subjective undertaking, and the degree of moral fault which the jury imputes to the tortfeasor is almost inevitably reflected in the liberality or parsimony of the pain and suffering [or solatium] award." *Freshwater v. Booth*, 160 W.Va. 156, 161, 233 S.E.2d 312, 315–16 (1977) (also see n. 2 therein).

Despite the jury's almost absolute discretion in determining the amount of the damages in a wrongful death case, and despite the lack of a statutory "cap" on the amount of the recovery in a wrongful death case, a jury verdict in a wrongful death case is subject to judicial review and, in an appropriate case, will be set aside as clearly excessive or clearly inadequate, and a new trial will be granted. Such a case, though, is exceptional. "Courts must not set aside jury verdicts [in tort cases] as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl., *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). *See also* syl. pt. 10, *Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603 (1983); syl. pt. 2, *Elsey Ford Sales, Inc. v. Solomon*, 167 W.Va. 891, 280 S.E.2d 718 (1981). "This rule is no[t] objective.... [It] does not of course remove the final judgment from the judges. [para.] But we are hereby admonishing our judges and ourselves ... not to interfere in the jury's domain except with extreme reluctance." *Addair, supra*, 160 W.Va. at 112, 232 S.E.2d at 825.

**6.** Citations herein are to the statute as amended in the year 1982. The 1985 amendment to

*W.Va.Code*, 55–7–6(d) is not relevant in this case.

There is no specific line of demarcation in this nebulous realm where the rights, duties and responsibilities of a court and jury meet. *Bower v. Brannon,* 141 W.Va. 435, 441, 90 S.E.2d 342, 346 (1955). Nonetheless, one point is certain: "a person who comes to an appellate court with a verdict of a jury, approved by the trial court, is in the strongest position known to the law." *Id.,* 141 W.Va. at 440, 90 S.E.2d at 346. Equally certain is that "[t]he law recognizes that the aggregate judgment of twelve duly selected and properly qualified jurors represents the best method yet devised for fixing the amount of just compensation to the injured plaintiffs in such cases [involving pain and suffering, mental anguish or other indeterminate damages]." *Sargent v. Malcomb,* 150 W.Va. 393, 400, 146 S.E.2d 561, 566 (1966).[7] Judge Calhoun, writing for a unanimous court in *Sargent v. Malcomb,* expressed these vitally important principles:

A jury verdict in a personal injury case may not be set aside as excessive by the trial court [and a new trial awarded] merely because the award of damages is greater than the trial judge would have made if he had been charged with the responsibility of determining the proper amount of the award. This Court cannot set aside a verdict as excessive in such a case [and award a new trial] merely because a majority or all members of the Court would have made an award of a lesser amount if initially charged with the responsibility of determining the proper amount of the award.

150 W.Va. at 401, 146 S.E.2d at 566. *Accord,* syl. pt. 5, *Earl T. Browder, Inc. v. County Court,* 145 W.Va. 696, 116 S.E.2d 867 (1960). The majority in the case now before this Court did not follow these precedents (and yet did not expressly overrule them), by arriving at its remittitur, as the majority opinion states, "after substantial collegial discussion[.]" Such action is an unconstitutional invasion of the province of the jurors. After a review of the cold pages of the record, three of my colleagues

in this case have substituted their opinions for that of the jury and the trial court on the factual question of the amount of damages, on the basis of undefined "sound public policy."

## B. REMITTITUR: NOT PROPER FOR INDETERMINATE DAMAGES

In a case involving indeterminate damages and where the amount of the jury's verdict is a clearly excessive sum under the passion-and-prejudice test set forth in *Addair, supra,* the appropriate remedy is the award of a new trial (perhaps limited to the issue of damages), not the entry of a remittitur. In such a case there would be no clearly ascertainable, illegal excess to remove from the total amount, leaving an amount properly found by the jury. While the amount after a remittitur is mathematically part of the larger sum found by the jury, it is a fiction to say that the jury "found" the smaller amount. Instead, the court would be substituting its opinion for the jury's. This Court has heretofore consistently adhered to this view that a remittitur is proper only where the excessive portion of the verdict is clearly distinguishable as a matter of law from the remainder of the verdict. For example, syllabus point 20 of *Jordan v. Bero,* 158 W.Va. 28, 210 S.E.2d 618 (1974), states the holding in this language:

"When the illegal part of the damages ascertained by the verdict of a jury is clearly distinguishable from the rest, and may be ascertained by the court without assuming the functions of the jury and substituting its judgment for theirs, the court may allow plaintiff to enter a *remittitur* [italics here in original] for such part, and then refuse a new trial." Syllabus point 2, *Earl T. Browder, Inc. v. The County Court of Webster County,* 145 W.Va. 696, 116 S.E.2d 867 (1960); syllabus point 4, *Chapman v. [J.W.] Beltz & Sons Co.,* 48 W.Va. 1, 35 S.E. 1013 (1900).

---

7. *W.Va.Code,* 56–6–11 [1985] now provides that a jury in a civil case shall consist of six members.

*See also Cochran v. Appalachian Power Co.*, 162 W.Va. 86, 96, 246 S.E.2d 624, 630 (1978); syl. pt. 3, *Fortner v. Napier*, 153 W.Va. 143, 168 S.E.2d 737 (1969); *Bragg v. C.I. Whitten Transfer Co.*, 125 W.Va. 722, 730, 26 S.E.2d 217, 221 (1943). The rule has also been stated more succinctly. "A remittitur is not proper unless the excessive part of the verdict is a sum certain determinable from the record." Syl. pt. 3, *Earl T. Browder, Inc. v. County Court*, 145 W.Va. 696, 116 S.E.2d 867 (1960) (collecting numerous cases decided by this Court).

I note that the practice of remittitur has been judicially abolished in all cases in the State of Missouri, in favor of the exclusive use of new trials. *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 110 (Mo.1985) (en banc).

## II. CONFLICT WITH CONSTITUTIONAL RIGHT TO JURY TRIAL

As noted in *Fortner v. Napier, supra,* and *Earl T. Browder, Inc. v. County Court, supra,* this Court has consistently followed the minority rule by refusing to allow a remittitur where the amount of the excess damages is indeterminable. Leo Carlin, then Professor of Law in the College of Law at West Virginia University, authored an excellent article on the subject of remittiturs and additurs. Carlin, *Remittiturs and Additurs*, 49 W.Va.L.Q. 1 (1942). Professor Carlin also noted that this Court consistently adhered to this minority rule. 49 W.Va.L.Q. at 29. He argued, forcefully, that such a rule is valid, especially in this jurisdiction in light of our relatively unique state constitutional provision (*W.Va.Const.* art. III, § 13, quoted *supra* at n. 3) preserving not only the right to a jury trial but also preserving the fruits thereof.

Professor Carlin observed that this Court in *Hickman v. Baltimore & O.R.R.*, 30 W.Va. 296, 4 S.E. 654, 7 S.E. 455[8] (1887), *overruled on another point, Richmond v. Henderson*, 48 W.Va. 389, 37 S.E. 653 (1900), held that the determination of not only the right to recovery but also of the amount of the recovery, where damages are unliquidated, is part of the jury trial guaranteed by *W.Va.Const.* art. III, § 13. He further observed that the state constitutions of only two states, namely, West Virginia and Oregon,[9] expressly safeguard the verdict in addition to guaranteeing the right to a jury trial. 49 W.Va.L.Q. at 21–22.

The "law" which is prescribed in our constitution as limiting the methods of reexamination of facts found by a jury is understood to be the common law which prevailed in the jurisdiction at the time when the constitution was adopted. *See Dimick v. Schiedt*, 293 U.S. 474, 476, 55 S.Ct. 296, 297, 79 L.Ed. 603, 606 (1935); *Kwass v. Kersey*, 139 W.Va. 497, 514, 81 S.E.2d 237, 246 (1954). The language in *W.Va.Const.* art. III, § 13 prohibiting the reexamination of a jury's findings of fact has remained unchanged since the adoption of the state constitution in 1872, with the exception of the addition in 1974 (in conjunction with the Judicial Reorganization Amendment) of the phrase, "according to rule of court[.]" Previously, factual findings of a jury were subject to reexamination "according to the rules of the common law."

The majority opinion does not purport to be, and certainly does not constitute, a "rule of court," but is an alteration of the common law, as it existed in the year 1872, and is fatal to the essence of the constitutional right to a trial by jury. It is, thus, prohibited by *W.Va.Const.* art. III, § 13. Any interpretation of the "rule of court" language contained in *W.Va.Const.* art. III,

**8.** The dissenting opinion of Judge Woods is separately published in the unofficial reports at 7 S.E. 455.

**9.** *See Van Lom v. Schneiderman*, 187 Or. 89, 210 P.2d 461 (1949). The court held that *Or. Const.* art. VII, § 3 prohibits a trial court or an appellate court from setting aside a jury verdict for unliquidated damages, and awarding a remittitur, regardless of the size of the verdict, or awarding a new trial, on the ground that the damages are excessive, unless "there is no evidence to support the verdict." *See also State ex rel. Young v. Crookham*, 290 Or. 61, 68, 618 P.2d 1268, 1272 (1980).

§ 13 which would condone more than procedural elasticity would eviscerate the constitutional protection of the jury verdict. *W.Va.Const.* art. III, § 13 allows some elasticity with respect to matters of procedural form and trial and appellate practice by referring, obviously, to the power of this Court, under *W.Va.Const.*, art. VIII, § 3, "to promulgate rules ... relating to ... practice and procedure, ..." For example, see *W.Va.R.Civ.P.* 49 on special verdicts and interrogatories. This rule modifies the common law use of special verdicts and general verdicts accompanied by answers to interrogatories. *See* M. Lugar and L. Silverstein, *West Virginia Rules of Civil Procedure* 365–66 (1960). The use of these procedural devices is not, however, inimical to the right to a jury trial because the jury still finds the facts and the factual findings are not "reexamined" by the court in the sense of substitution of opinion. Directing the entry of a remittitur in a case involving indeterminate damages is not, however, a matter of form and practice but, instead, involves the very substance of the constitutional right to a jury trial. "If the result of the verdict (in this case the amount) is not a matter of substance, it may very well be asked, What constitutes the substance of a jury trial?" 49 W.Va. L.Q. at 24. "What interest any party can have in a jury trial, except on the expectation of a jury determination of his rights or liabilities, is difficult to imagine." *Id.*

One of the rules of practice and procedure promulgated by this Court is *W.Va. R.Civ.P.* 38(a), which provides that "[t]he right of trial by jury as declared by the Constitution or statutes of the State shall be preserved to the parties inviolate." The majority opinion is in violation of this rule and the Bill of Rights.

At common law, with a few aberrations,[10] a remittitur in a case involving indeterminate or unliquidated damages was not proper, and the only recourse to correct a verdict for a clearly excessive sum in such a case was to grant a new trial by jury. *Dimick v. Schiedt,* 293 U.S. 474, 477–85, 55 S.Ct. 296, 297–300, 79 L.Ed. 603, 606–10 (1935).

The Court in *Dimick* rejected the argument that the constitutional right to a jury trial could be altered by court decision on the ground that such right was premised upon the common law right to a jury trial and the courts retain the power to change the common law to meet changed conditions:

> It is said that the common law is susceptible of growth and adaptation to new circumstances and situations, and that the courts have power to declare and effectuate what is the present rule in respect of a given subject without regard to the old rule; ... The common law is not immutable, but flexible, and upon its own principles adapts itself to varying conditions. [citation omitted] But here, we are dealing with a constitutional provision which has in effect adopted the rules of the common law, in respect of trial by jury, as these rules existed in 1791 [the year in which the Federal *Constitution* was adopted]. To effectuate any change in these rules is not to deal with the common law, *qua* common law, but to alter the Constitution. The distinction is fundamental, and has been clearly pointed out by Judge Cooley in 1 Const. Limitations, 8th ed., 124.

293 U.S. at 487, 55 S.Ct. at 301, 79 L.Ed. at 611.

---

**10.** *Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), holding an additur to be improper in federal courts as a violation of the right to a jury trial under the Federal *Constitution,* also contains a discussion of, and attempts to distinguish, remittiturs. The opinion recognizes but strongly questions as unreasoned the few older English precedents, antedating adoption of the seventh amendment in 1791, which permit remittiturs in cases involving unliquidated damages. The opinion also strongly questions, therefore, the validity of prior opinions of

the Supreme Court of the United States upholding, without citation of common law authority on point, remittiturs in such cases in federal courts. The Court in *Dimick* felt compelled, however, under *stare decisis,* to continue to allow remittiturs in cases in federal courts involving a clearly excessive, unliquidated-damage award. Prior to the majority opinion in the case now before this Court, the contrary rule, in accord with the common law embedded in *W.Va. Const.* art. III, § 13, was *stare decisis* in this jurisdiction.

The following is a good summary of the unconstitutionality of a remittitur in a case involving indeterminate damages:

[A]s long as the law, particularly in the form of constitutional sanctions, gives to a party the *right* to a jury trial, it would seem that the right should carry with it the privilege of determining its expediency. [emphasis in original] The only object in protecting the right with constitutional sanctions must have been to give a litigant power to make an arbitrary choice and prevent legislatures and courts from determining any question of expediency. Otherwise, the whole matter would have been trusted to legislative and judicial regulation.

... If there ever was anything which needed the aid of sophistry and artificial logic, it would seem to be a demonstration that the court, when it allows a remittitur or an additur under ordinary circumstances in a personal injury case, does not substitute its judgment for that of the jury. If the substitution takes place, how can it be asserted with any semblance of realism that the jury has tried the case and the parties have had a jury trial? Those who assert the contrary do not need to resort to the 'legal scrap heap', or any other source of precedents, to defend their stand. All that is necessary is to face the situation with a realism unadulterated with preference and let common sense have full sway.

49 W.Va.L.Q. at 36–37. The common sense of the people as expressed in the state constitution should prevail. "The constitutional scriveners did not repose in the bench the responsibility for finding facts, but in the peers of those seeking justice." *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 112, 232 S.E.2d 821, 825 (1977).

### III. DAMAGES NOT EXCESSIVE

As discussed above, a remittitur is not proper in this case. A new trial is not proper, either, because the finding of liability is supported by the evidence, and the amount of damages found is not "monstrous, ..." as set forth in *Addair, supra.*

The $10,000,000.00 verdict in this case would be divided among four individuals.[11] The emotional damages sustained were substantial, permanent[12] and "extraordinary" (according to the undisputed testimony of the plaintiff's expert witness, a clinical psychologist). While no amount of money will "compensate" for the inconsolable grief, the wrongful death statute requires the jury to determine an amount of damages which is "fair and just" in the jury's opinion, and there is no maximum limit of recovery under the statute. To determine whether the jury's verdict should be set aside as "monstrous" and a new trial awarded, it is usually not very profitable to compare verdicts in other cases because "the character of the injuries sustained, and their resultant effect upon the injured party, ... are never identical, and but seldom similar." *Williams Paving Co. v. Kreidl*, 200 Va. 196, 204, 104 S.E.2d 758, 764 (1958).[13] A couple of comparisons,

---

**11.** An equal allocation of $2,500,000.00 for each of the four plaintiffs is assumed for purposes of this opinion because the jury did not direct a different allocation as *W.Va.Code*, 55–7–6(b) [1982] authorizes. I also note that the jury failed to comply with *W.Va.Code*, 55–7–6(c)(2) [1982], which requires the jury to set forth separately the amount of pecuniary damages for reasonable funeral, hospital, medical, etc., expenses (here totalling $6,872.55). Consequently the entire verdict will be deemed, for purposes of this opinion, to be for nonpecuniary, emotional damages.

**12.** The life expectancies of these four individuals, the father, mother and two siblings, were, respectively, 33.6 years, 46.6 years, 64 years and 66.9 years.

**13.** For collections of cases involving the wrongful death of a minor child see annot., 49 A.L.R.3d 934 (1973 and Supp.1985), especially § 5 on infants under seven years of age; 2 S. Speiser, *Recovery For Wrongful Death* § 9:21 (2d ed. 1975 and current Cum.Supp.) (decedents below seven years of age); J. Stein, *Damages and Recovery: Personal Injury and Death Actions* § 253 (1972 and Cum.Supp.1985).

Comparing verdicts in other cases, from our own jurisdiction or others, is a dangerous game, to say the least. No two persons are alike. No two injuries are alike. No two juries are alike. Unlike workers' compensation, awards for pain and suffering in personal injury actions or for solatium in wrongful death actions should not be based upon pre-determined schedules. The worth and dignity of the individual is a touch-

however, may be made as illustrative of the relative size of the verdict in this case to show that it is not a "shocking" amount.

In *Rawson v. Sears, Roebuck & Co.*, 615 F.Supp. 1546 (D.Colo.1985), the court denied the defendant's motion for a remittitur or new trial after a jury verdict of $19,000,-000.00, including $5,000,000.00 for pain, suffering and humiliation, in favor of a 60-year-old plaintiff who had been discharged in violation of a state age discrimination statute. Compared to an award of $5,000,-000.00 for emotional injuries sustained by an individual, the verdict in the case now before this Court is not excessive at all, much less "monstrous." Here, the award is to be divided among four individuals who have much longer life expectancies than the plaintiff in *Rawson, supra,* and the emotional injuries are far more severe.

A second indicator of the relative size of the verdict in this case is the fact that, according to Jury Verdict Research, Inc., the average verdict in the year 1985 in medical malpractice cases in this country exceeds $1,000,000.00. Church, *Sorry, Your Policy is Canceled,* Time, Mar. 24, 1986, 16, 20. The evidence in this case indicates that each of the four individuals who would recover damages (before deducting attorney's fees, etc.) sustained "extraordinary," not merely "average," damages.

It must also be remembered that the verdict here was for permanent damages. Damages in a wrongful death case for non-pecuniary losses, such as mental anguish (unlike damages for pecuniary losses), should not be reduced to present value. Syl. pt. 3, *Mooney v. Eastern Associated*

*Coal Corp.*, 174 W.Va. 350, 326 S.E.2d 427 (1984). The jury is not to determine its award for solatium in a wrongful death case by determining a lump sum amount which, when invested, will result in an annual amount which is at once fair and just. Whether an award for solatium is excessive is not properly determined by calculating its annual yield. *Pippen v. Denison*, 66 Mich.App. 664, 677, 239 N.W.2d 704, 710 (1976); *Wry v. Dial*, 18 Ariz.App. 503, 514, 503 P.2d 979, 990 (1972), *review denied* (1973).[14]

No one doubts that the verdict is large. No one doubts, either, that the parents and siblings of Michael, the decedent, have endured and will continue to endure the ultimate loss. "The highest privilege that is given one in this life is to 'rear and conduct through the vicissitudes of childhood and educate and maintain' one's children; no greater source of happiness pertains to this life." *Sample v. Consolidated Light & Ry.*, 50 W.Va. 472, 473, 40 S.E. 597, 598 (1901). *Accord, Compania Dominicana de Aviacion v. Knapp*, 251 So.2d 18, 24 (Fla.Dist.Ct.App.1971), *cert. denied*, 256 So.2d 6 (Fla.1971). That a damage award is "precedent shattering" is of little moment when the damages are in fact supported by the record. *Pippen v. Denison*, 66 Mich.App. 664, 677, 239 N.W.2d 704, 709–10 (1976). While the amount of the verdict is substantial, in a relative sense it is no more substantial than the injuries sustained by the decedent's survivors. *Kiniry v. Danbury Hospital*, 183 Conn. 448, 464, 439 A.2d 408, 416 (1981); *Pisel v. Stamford Hospital*, 180 Conn. 314, 344, 430 A.2d 1, 16 (1980).[15]

stone of our society. *Wry v. Dial*, 18 Ariz.App. 503, 514–15, 503 P.2d 979, 990–91 (1972), *review denied* (1973).

**14.** *Mooney v. Eastern Associated Coal Corp., supra* in the text, effectively overruled *Brewer v. Appalachian Constructors, Inc.*, 138 W.Va. 437, 453, 76 S.E.2d 916, 925 (1953), to the extent that *Brewer* calculated an annual yield on a verdict (including an award for pain and suffering) and found the verdict to be excessive when the annual interest on the verdict nearly equalled the plaintiff's lost annual future earnings and would also leave the lump sum award intact at the end of the plaintiff's life expectancy.

**15.** I will not extend this already lengthy dissenting opinion with a discussion of essentially public policy issues which are raging in the state legislatures and in Congress, specifically, whether there is a need for "tort reform," such as, "ceilings" on pain-and-suffering awards, limits on attorneys' fees, etc., and who is to "blame" for the so-called liability insurance "crisis"—judges, juries, lawyers, doctors or other health care providers, insurance companies, etc.

Statutory "ceilings" on pain-and-suffering and solatium awards would not run afoul of the second sentence of *W.Va. Const.* art. III, § 13 because the ceilings would not constitute a legislative "reexamination" of facts (amount of dam-

## IV. PRACTICAL PROBLEMS

I compliment all trial counsel in this case for their very able representation of their respective clients. I believe, however, that the majority opinion will create more problems and raise more questions than it has resolved.

For example, may a trial court also direct a remittitur (with the option of a new trial) in a case involving indeterminate or unliquidated damages? If trial judges may direct a remittitur they will be "flying solo" because they will be unable to engage in "substantial collegial discussion" to arrive at sound amounts for remittiturs. If a reviewing court is to consider the parties' deliberations (the pretrial settlement negotiations) in arriving at a "proper remittitur," why should the trial court or the reviewing court not also have access to the jury's deliberations to assist them in substituting their opinions on the amount of damages for the jurors' essentially advisory opinions on the same? May a trial court or the appellate court substitute its opinions for the jurors' opinions on the amount of indeterminate damages and direct additurs?

The majority opinion gives no guidelines for its "state of the art" remittitur concept. It is difficult, therefore, to predict the ramifications of this amorphous decision. It has "junked" valuable precedents into the "legal scrap heap," and virtually all that remains is the thick "smoke" from the "bulldozer's" operations. I do predict, though, that the majority will "torture" the facts in future cases to attempt to distinguish this case from those cases which may also involve remittitur issues.

ages) found by a jury but would merely place a limit in advance on the amount of damages to be found by the jury. There would be no substitution of opinion on the amount of damages.

I express no opinion here on whether ceilings on pain-and-suffering awards in common law tort cases would violate the first sentence of *W.Va. Const.* art. III, § 13 or any other state constitutional provision. *See generally* Note, *Medical Malpractice—Constitutionality Of Limits On Liability,* 78 W.Va.L.Rev. 381, 386–90 (1976) (suggesting that statutory limits on liability in

## V. CONCLUSION

In all of this discussion I do not forget the senseless and tragic death of Michael and the unbearable loss sustained by Mr. and Mrs. Roberts and their other children, "Pepper" and Ritchie.

"Those who have not brought a child into the world and loved it and planned for it, and then have it suddenly snatched away from them and killed can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy. No other affliction so tortures and wears down the physical and nervous system."

*Barrett v. Charlson,* 18 Md.App. 80, 93, 305 A.2d 166, 174 (1973), quoting *Winner v. Sharp,* 43 So.2d 634, 636–37 (Fla.1949).

My primary concern lies with the citizens of our State who have become victims of the tort system turbulence. In time, this issue will fade on the yellowed pages of history but the short-term expedient solutions reached by the major decision makers of our State will have inflicted permanent damages on innocent injured parties.

Based upon all of the above, I dissent.

I am authorized to state that Justice McGRAW joins me in this dissent and files a further dissent.

McGRAW, Justice, dissenting:

I join Justice McHugh in his dissent, and add the following observations.

The majority's willingness to compromise our democratic ideals is the key to understanding the result in this proceeding. West Virginia Constitution art. III, § 10 provides, "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his

common law personal injury actions violate the right to access to the courts guaranteed by *W.Va. Const.* art. III, § 17; contrasting statutory limits on liability in statutory actions, such as wrongful death actions or workers' compensation cases, and distinguishing the statutory abolishment of alienation of affections actions, as the latter involved disruption of personal relations as opposed to "an injury done to [a person], in his person, property or reputation" set forth in *W.Va. Const.* art. III, § 17).

peers." West Virginia Constitution art. III, § 13 provides, "In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved." The majority concedes that no reversible error of law occurred in the trial of this matter. It was a fair trial. Yet, asserting that the jury's verdict is so monstrous as to indicate that it was motivated by passion or partiality or prejudice or corruption, the majority substitutes its view of the proper amount of damages for that of twelve members of the community chosen under law to decide the case under the instructions of the trial court.

Available insurance coverage, as noted by the majority, was $10,250,000. In recognition of realistic, practical possibilities, the defendants' insurance companies had said, "We will pay up to $10,250,000 for any harm you might negligently cause to any individual in exchange for the payment of premiums commensurate with this amount of coverage." The negligent acts of the defendants resulted in the death of 2½-year-old Michael Roberts. The degree of malpractice associated with the commission of these acts is nothing short of horrifying. Michael Roberts suffered immeasurably because of these negligent acts. His father, his mother, and his brother continue to suffer immeasurably after his death. The jury, unaware of the amount of available insurance coverage, understandably shocked by the degree of medical malpractice demonstrated by community health professionals, returned a verdict of $10,000,000, remarkably close to the maximum amount of available insurance coverage for the most harmful acts of malpractice anticipated by the insurance companies.

After contracting to provide coverage in excess of the amount of the verdict, however, the insurance companies, in effect, came to this Court with a plea that less than what they had contracted for and received premiums for was still too much. The insurance companies effectively argued that it was anticipated that their insureds, these community health professionals, could commit even more horrendous acts of malpractice which could result in even greater harm to their prospective patients. The insurance companies coldly asserted that this case was simply not "worth" $10,000,000 and maintained that reduction to a more "reasonable" figure was appropriate. So, with incredible candor, the majority admits that its members put their heads together and came up with a figure of $3,000,000. In other words, the majority anticipates that the defendants could combine to commit acts of malpractice resulting in over three times the amount of harm to a single individual than the amount of harm to Michael Roberts and his family. I readily concede my inability to imagine a set of circumstances over three times more tragic than the circumstances presented in this case.

Notwithstanding the majority's obvious disdain for the regular citizen, masqueraded as a pedantic discourse on Gothic architecture, an argument *"ignoratio elenchi,"* the juror is an integral part of our democratic ideal, representing the conscience of the community. The great cathedrals of Europe stand not only as monuments to man's ingenuity, but symbolically as monuments to man's faith. The greatness of medieval cathedrals derives not from the character of their construction, but from the character and vision of the ordinary men and women who dedicated their lives to the service of an ideal. The majority states, "Greatness in architecture is not achieved by creating a superb structure from superb materials; it is achieved by creating a superb structure from mediocre materials. The same general criterion of judgment applies to government.... Courts understand that juries operate on largely emotive principles and that jury awards can be substantially in excess of what judges, educated in law as a science, would award in similar circumstances." Thus, according to the majority, jurors are "mediocre materials," who operate not on reason, but "on largely emotive principles," particularly in comparison to judges, who are "educated in law as a science." Never has a more arrogant statement been ut-

**514**

tered by this Court in support of blatant judicial fiat. Furthermore, just as erection of medieval cathedrals was sometimes achieved through the impoverishment of parishioners, the majority's protection of the profitability of insurance companies is achieved only at the expense of the legal and moral rights of those injured by medical malpractice. Better understanding can be gained by analogizing the majority opinion in this case to the practice of government described in R. Sherrill, *Gothic Politics in the Deep South: Stars of the New Confederacy* (1968), than can be gained by analogizing it to Gothic architecture.

The American system of government stands not as a monument to man's ingenuity, but rather as a monument to man's faith in democratic ideals. The greatness of the American system of government derives not from the character of its construction, but rather from the character and vision of the ordinary men and women who have dedicated their lives to service of democratic ideals. Recently, in dissenting from another usurpation of the province of a jury, I noted that:

> Chesterton, the "prince of paradox," framing the experience of two millennia in *Tremendous Trifles: The Twelve Men,* said:
>
>> "Our civilization has decided, and very justly decided, that determining the guilt or innocence of men [natural or artificial] is a thing too important to be trusted to trained men. It wishes for light upon that awful matter, it asks men who know no more law than I know, but who can feel the things that I felt in the jury box. When it wants a library catalogued, or the solar system discovered, or any trifle of that kind, it uses up its specialists. But when it wishes anything done which is really serious, it collects twelve of the ordinary men standing round. The same thing was done, if I remember right, by the Founder of Christianity." Gilbert K. Chesterton, *Tremendous Trifles: The Twelve Men* 86–87 (1922).

*Delp v. Itmann Coal Co.,* 176 W.Va. 252, 342 S.E.2d 219, 223 (1986) (McGraw, J.,

dissenting). Ours is a government, in the immortal words of Lincoln, "of the people, by the people, and for the people." Ours is not a government, as the majority would have it, "of philosopher kings." Loss of faith in the will of the people, here expressed as a verdict by twelve members of the community, means loss of faith in our democratic system of government. Unlike the majority, faith in our people and our democratic ideals should not waiver. In Sir Patrick Devlin's book *Trial By Jury* 147 (3d ed. 1966), he observed that, "The malady that sooner or later affects most men of a profession is that they tend to construct a mistique that cuts them off from common man." Agreement with this fitting epitaph for the majority opinion in this case compels dissent.